some ground for the allegation of inadequacy of the charge as recognized by the trial judge himself, but as a whole, we are not prepared to say that the charge did not give the jury instructions sufficient to enable it to apply the correct rule in ascertaining the damages and in determining the negligence of the defendant.

The judgment is affirmed.

---

## Daltry v. Media Electric Light, Heat & Power Company, Appellant.

Argued Feb. 9, 1904. Appeal, No. 226, Jan. T., 1903, by defendant, from judgment of C. P. Delaware Co., Sept. T., 1901, No. 106, on verdict for plaintiff in case of John L. Daltry v. Media Electric Light, Heat & Power Company. Before MITCHELL, C. J., DEAN, FELL, MESTREZAT and THOMPSON, JJ. Affirmed.

OPINION BY MR. JUSTICE MESTREZAT, March 14, 1904:

We have considered the questions raised on this record in the opinion filed this day in the case of James W. Daltry v. Media Electric Light, Heat & Power Company, and for the reasons there given this judgment is affirmed.

---

## Caughey, Appellants, v. Bridenbaugh.

*Will—Probate—Undue influence—Evidence.*

On an issue devisavit vel non where it appears that the testatrix, an elderly widow, without near relatives, of perfectly sound mind, and with full knowledge of what she was doing, made her will, giving the bulk of her estate to her pastor and his family, binding instructions in favor of the will are proper, where the evidence shows that during the closing years of the testatrix's life, she lived in great intimacy with her pastor, his wife and family, that she received kindnesses from them, gave them presents, and settled a portion of her estate during her lifetime upon her pastor, and there is no evidence whatever of any influence or persuasion exercised upon her by the beneficiaries either before the making of her will, or at the time thereof.

Argued Feb. 29, 1904.   Appeal, No. 36,  Jan. T., 1904, by plaintiff, from judgment of C. P. Berks Co., Oct. T., 1902, No. 84, on verdict for defendant in case of Ella L. Caughey, Frank D. Shouse and Carrie L. Thomson v. Samuel R. Bridenbaugh.   Before FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ.   Affirmed.

Issue devisavit vel non.

At the trial the court gave binding instructions for defendant.

On a rule for a new trial ENDLICH, J., filed the following opinion :

In an issue tried in the common pleas involving the validity of a will assailed on the ground of undue influence, testamentary incapacity, etc., the trial judge sits as a chancellor : McCormick v. McCormick, 194 Pa. 107, 117 ; Robinson v. Robinson, 203 Pa. 400, 416. If there is no evidence beyond a scintilla to sustain the contestants' allegation, it becomes his duty, of course, to instruct the jury in favor of the will : Eckert v. Flowry, 43 Pa. 46 ; Barbey v. Boardman, 202 Pa. 185. But that is not the whole of his duty.   In every case tried before a jury in which the trial judge sits as a chancellor, the evidence is addressed to him quite as much as to the jury— must as a whole be judged of by him independently of the jury —must satisfy his conscience as well as the jury—and cannot be rightfully submitted to the jury as the basis of any finding which he would not approve ; in a word, he cannot permit the jury to do what he, as a chancellor, would not do : Rowand v. Finney, 96 Pa. 192; Reno v. Moss, 120 Pa. 49.   And since it is his individual judgment upon the evidence given before him, by witnesses appearing before him, that is to control his action, the duty referred to is properly to be performed at the trial of the issue by directing a verdict clearly required, rather than submitting an inadequate case to the jury and in the event of their conclusion being unsatisfactory, setting it aside, or possibly, where the issue is framed as this one was, entering judgment non obstante veredicto ; for these are remedies applied under our statute by the court in banc, not by the trial judge as such, and the application of either tends to pro-

duce the appearance, always to be regretted, of a difference of opinion between court and jury.

In the present case there is really no conflict of testimony. The testatrix was a member of a German reformed congregation of which proponent was and is the pastor. It was not until quite near the close of 1898 or the beginning of 1899 that the relations between them were anything but the ordinary ones of pastor and parishioner. For years in matters of investments, and in 1898 in the settlement of the estate of her sister with whom she had lived, who died in March of that year, and from whom she derived the bulk of her property, then amounting in the whole to about $20,000, testatrix had had the services of a certain member of this bar. She had expressed to him (as she did to others) her annoyance over the fact that the greater part of her estate, upon which collateral inheritance tax had been paid when it came to her from her sister, should again be subject thereto upon her own death; had asked him how that could be avoided, and had been told by him (as she was by others) that she could avoid it by giving away her property while she lived. She had spoken to him in an indefinite way about drawing her will; but she had actually asked this service of an old and intimate acquaintance, the husband of a cousin, who was not a lawyer. She seems to have had little intercourse with most of her relatives, and not much kindly feeling for the contestants who are the nearest of her blood, but through whose father she had lost heavily. In the earliest intimations she gave of her intentions concerning the disposition of her property, she disclosed the purpose of excluding the contestants from any share in it, but yielded to the persuasion of the person with whom she was discussing the matter, and who was to draw her will, so far as to say that she would leave them the house she lived in or its equivalent in money—which is substantially what the will in dispute gives them.

In the fall of 1898 the testatrix requested the proponent to call upon her more frequently than it had been his custom to do. It was in December of that year that she first mentioned to him the matter of a will, requesting his advice as to some church charity she might remember with a bequest, whereupon he named several for her consideration. Early in 1899, having

made up her mind on this subject, she asked him to write her will and dictated to him a number of items which he took down by way of memoranda. When she asked him to be the executor of the will, he declined to write it, but suggested among others Rev. A. C. Whitmer, of Lancaster, with some of whose writings on mission matters the testatrix was acquainted, and whom eventually the proponent invited to Reading for the purpose. The issue, as formulated in the precept of the orphans' court, making the contestants the plaintiffs, they at the trial admitted the due execution and proof of the will in controversy, and called and accredited as their witnesses the only persons who, besides the proponent, know anything whatever about the manner and time and circumstances of the making of it or of either of the two wills that preceded it. By their testimony it appears that in February, 1899, Whitmer, at proponent's invitation, came to his house in Reading, there met the testatrix, and the proponent being in and out of the room, wrote her will, using memoranda, in proponent's handwriting—each being read by the scrivener to the testatrix and approved by her—all of them referring to specific bequests, and none of them to the proponent's being named as executor or residuary legatee. The direction to that effect was given by the testatrix. Executed at proponent's house and witnessed by the scrivener and a physician living nearby, whom proponent called in, the will was taken away by testatrix after demonstrative acts and expressions on her part of satisfaction with what she had done.

Early in March of the same year the testatrix transferred to the proponent, without consideration, upon the books of the Farmers' and Union banks, eighty-eight shares of the stock thereof, worth $7,194, the dividends upon which were, while she lived, handed to her by proponent as he received them.

About two weeks thereafter, Rev. A. C. Whitmer was again called to Reading by a letter from proponent advising him that testatrix desired to alter her will. Meeting her at proponent's house, he was told by her that she wished the same person to rewrite her will as had written it, and proceeded to do so according to her directions—the changes made relating to minor items, of which there was quite a number, but marking no departure from the main original disposition of her estate. After the writing and before the execution of this instrument, Whit-

mer, while alone with the testatrix, asked her whether any one had influenced her in making any part of this will—to which she replied with an emphatic no. On this occasion also the same scrivener drew a deed (from hers brought with her by the testatrix), in which for the consideration of one dollar, the testatrix conveyed to proponent the house she lived in. Both instruments were executed (and the deed acknowledged) the following morning, testatrix calling at proponent's house for Whitmer who was to witness the execution of both. The will was retained by testatrix. The deed was not put upon record. It was subsequently on or about June 4, 1901, returned to and destroyed by the testatrix, who at the same time executed another drawn by proponent's son (then a student at law) by proponent's direction, reserving to the grantor a life estate in the property. A consideration is therein mentioned of $1,900, the value put upon the property by the testatrix (about $2,100) less the value of the life-estate as estimated by the scrivener. No consideration, however, passed. This deed remained unrecorded while testatrix lived.

In August, 1901, the testatrix at proponent's house asked his son to rewrite her will, which he agreed to do, and for which purpose they met at the same house a day or two after. The will to be rewritten was over two years old and had three or four codicils added to it in testatrix's handwriting. She directed a few changes, the most important being a bequest of $500 to Florence Ball (of which the latter knew nothing). The scrivener simply rewrote the provisions of the old will and its codicils with the alterations directed. When drawn, the instrument was read over to testatrix, handed to her, and examined, pronounced satisfactory and taken away by her. The following morning, by appointment, she brought it to the office of the scrivener's preceptors and there, after again looking over it, executed it, expressing her surprise and approval at the formality of signing every page, because "so many signatures should make a will proof against attack." She took the executed will with her when she left the office, and subsequently gave the scrivener a fee for drawing it. Sometime thereafter, she handed the will to the proponent, and it remained in his custody until it was probated. To Whitmer, the testatrix on one occasion spoke of this will, explained her rea-

sons for having it made anew, and expressed her contentment with it. This is the will contested in this proceeding.

At the time of her death, April 29, 1902, the testatrix was seventy-seven years old. The closer association with proponent, which she had sought, had become an intimacy that embraced his family and continued to the end. There is no evidence of the utterance by her of any complaints of, or dissatisfaction with them. She often spoke of them as her chosen friends—her friends not by proximity or long acquaintance but by choice. Proponent's visits to her were frequent. So were hers at his house. It became her habit to dine there on Sundays. She gave the members of the family Christmas remembrances, and at various times, the last three or four days before her death, made money presents to proponent ranging from $10 to $400, and aggregating $615.50. She sought and had his assistance in some business matters. Once he advised her in the purchase of a small house. Another time, in September, 1899, he was active in procuring an assignment to her of a $3,000 mortgage upon the parsonage belonging to the church and occupied by him, the interest on which he had been paying to the mortgagee and continued thereafter to pay to her. On another occasion, in October, 1899, he found for her an investment for $2,800 upon a judgment note of two of his parishioners, one of them the physician who witnessed her will. As the intimacy between her and proponent and his family went on, cultivated on both sides, there was a corresponding impairment of the frequency and doubtless the cordiality of her intercourse with her neighbors; especially when her dependence upon their attentions became diminished by her employing, in the fall of 1899, as a companion, a young woman, Florence Ball, who had been for a few years prior to 1894 an inmate of proponent's household—whom, upon testatrix's inquiring for a suitable person, proponent's wife had suggested—to whom, at testatrix's instance, she had written to Los Angeles, Cal., where she was living with her brother—and who, at her own and her brother's expense, had come on to take the situation. There is nothing in the evidence to show that testatrix was mentally or bodily weak. On the contrary, it is evident that she was a woman of a rather positive sort, of strong feelings, and physically and intellectually well preserved. She was in

the habit of making annual visits to friends at some distance from Reading, at Lititz, Easton, etc., always except once unattended. One of these visits she made alone shortly before her death. Her handwriting, of which there are in evidence several specimens, done both before and subsequently to the will, shows a regularity and firmness quite remarkable considering her age, while the style and substance of the writings convey no suggestion whatever of mental decay, but rather of alertness and vigor.

The statement of facts thus far given comprises the substance of the relevant testimony whose correctness is either admitted or is beyond the possibility of dispute by the contestants, or comes from witnesses other than the proponent, standing uncontradicted. It includes nothing resting in the uncorroborated testimony of the proponent, whose credibility the contestants are, of course, at liberty to question. His testimony—and under the rule established by a long line of decisions from Brawdy v. Brawdy, 7 Pa. 157, down, as applicable to cases tried before a jury in which the trial judge sits as chancellor, it cannot be ignored, but in so far as it is responsive must be overcome—positively denies the assertion by him of, or the attempt to exert, any influence over the testatrix by suggestion, persuasion or prompting of any description, save that he admits having recommended to her a certain church charity with a view to a bequest which she refused to consider. He asserts, detailing testatrix's acts and statements as well as his own, that in all the benefits conferred upon him or his family by her, executed during her life or to take effect after her death, she acted without any solicitation or constraint, moved solely by kindly feelings towards himself and friendly affection and devoted interest in his family. He avers, again giving conversations, etc., that the methods pursued, whereby what she did remained unknown to her relatives, were adopted in deference to her explicit desire that they should so remain; that he had nothing to do with bringing Florence Ball from the west to live with testatrix; that she at all times had perfect control over her will even in his hands; and that his custody of it, beginning some time after its final execution, had its origin, according to testatrix's statement to him, in the misbehavior and threats of a cousin who wanted to be made her executor, whom

she objected to, and whose violence she feared—and it may be noted that in this he is corroborated by two writings of the testatrix preserved with her will. He does not pretend to have advised her to consult an attorney about her will or to employ one to write it. But he swears that the suggestion of a scrivener from out of town was hers, and that the selection of the particular persons who acted in that capacity was her own deliberate act. As to the conveyance of the house and the transfer of the bank stock, he testifies that they were made at her repeatedly expressed desire to do in her lifetime what would otherwise have to be done after her death—the thought of it having come to her, as she explained, through a recent gift of bank stock by another old lady in Reading to a pastor.

In considering the effect of all this, it is necessary to bear in mind the meaning of the term " undue influence" as affecting the validity of a will. The word " undue " in this connection is not used in the sense lexicographers give to it as one of its popular meanings—" disproportionate," " inordinate," " unworthy," as in the phrases "undue excitement," "undue partiality," " undue attachment," or the like. As a legal phrase, it is used in a stricter sense as denoting something wrong according to a standard of morals which the law enforces in the relations of men, and therefore something legally wrong, something violative of a legal duty—in a word something illegal. And again the word "influence" does not refer to any and every line of conduct capable of disposing in one's favor a free and self-directing mind, but to a control acquired over another which virtually destroys his free agency. In Browne v. Molliston, 3 Whart. 129, it was said, at p. 138, that, in order to constitute undue influence sufficient to avoid a will, " there must be imprisonment of the body or mind; " nor is there a decision in Pennsylvania which recognizes anything short of that as satisfying the legal definition of undue influence. Indeed that definition, as indispensably involving the existence of fraud, or threats, or misrepresentation, or circumvention, or inordinate flattery, or physical, or moral coercion to such a degree as to subjugate the mind of the testator, to destroy his free agency and to operate as a present constraint upon him in the making of the will, has been so thoroughly settled in this state that it is only necessary to cite the recent decisions in

Logan's Est., 195 Pa. 282, 289, and Englert v. Englert, 198 Pa. 326, 331. It may be more important for present purposes to refer, in some detail, to cases which specifically point out what is not undue influence. In Miller v. Miller, 3 S. & R. 267, Mr. Chief Justice TILGHMAN says, at p. 269:

The procuring a will to be made, unless by foul means, is nothing against its validity. . . . A man has a right, by fair argument or persuasion, to induce another to make a will, and even to make it in his own favor.

And Mr. Justice DUNCAN adds, at p. 270:

Influence, persuasion, may be fairly used. A will may be honestly procured. Many wills, indeed, would be destroyed if you inquire into the degrees of influence and persuasion. A will procured by circumvention will be set aside; but a will procured by honest means, by acts of kindness, attention, and by importunate persuasion, which delicate minds would shrink from, would not be set aside on this ground alone.

In Tawney v. Long, 76 Pa. 106, Mr. Justice GORDON says, at p. 115:

It has been held that general bad treatment furnishes no evidence of such (undue) influence, and we may add, neither does general kindness, though this may have a powerful influence upon a weak mind, unless it is shown to be part of a crafty arrangement to procure the testamentary disposition.

In Trost v. Dingler, 118 Pa. 259, the same learned judge says, at p. 270:

Solicitations, however importunate, cannot of themselves constitute undue influence; for though these may have a constraining effect, they do not destroy the testator's power to freely dispose of his estate.

In Englert v. Englert, supra, the language just quoted is approvingly repeated by Mr. Justice BROWN, at p. 331; and in Robinson v. Robinson, 203 Pa. 400, 435, 436, instructions to the same effect are pronounced correct.

To these authorities may be added Leech v. Leech, 5 Clark, 86, where Judge KING says, at p. 92:

Kindness, attention, care and devotion manifested towards a testator are not undue influence over him, such as would invalidate his will. Nor will fair solicitations by a party in whose favor it is made impeach it—and the observation of Lord PEN-

ZANCE, in Parfitt v. Lawless, L. R. 2 Prob. & Div. 462, that undue influence, to set aside a will—must not be the influence of affection or attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act.

It is thus very manifest that undue influence is not to be predicated of an impression, though seemingly exaggerated, that is produced upon another by kindly offices, gratifying attentions, the force of mutually voluntary association revealing secret needs and unspoken desires. Neither does it consist in bad taste, in a want of delicacy, in a willingness to cultivate another's good graces even with a view to possibly profiting thereby, or in a readiness to accept benefits generously and undeservedly offered. These and similar things belong to the domain of what Chief Justice GIBSON in Kintzing v. McElrath, 5 Pa. 467, 469, calls "principles of morality too subtle for administration by an earthly tribunal," and therefore not attempted to be enforced by our law. The latter contents itself with declaring, as was declared in Robinson v. Robinson, supra, that a testator may be coaxed, but must not be driven either by mental coercion or by physical force. And hence, when undue influence is alleged, the inquiry is not whether the beneficiary's conduct was that which was becoming to him in his station, whether it was judicious, discreet, high-toned or disinterested, but whether there was any wrong in it whereby the free agency of the testator was set at naught in the making of his will. That wrong, where its end and purpose are the benefit of the party perpetrating it, is practically indistinguishable from fraud: Boyd v. Boyd, 66 Pa. 283, 293.

Coming now to the question of the evidence necessary to establish this wrong without direct proof of it, it is as true of this sort of cases as it is of others in which fraud is charged (see Mead v. Conroe, 113 Pa. 220, 228) that it cannot be made out by circumstances which, though to be expected if there was fraud, are equally consistent with its absence, and that such circumstances cannot, whether taken singly or collectively, justify an inference of wrongdoing. In the language of the Lord Chancellor, in Boyse v. Rossborough, 6 H. L. Cas. 2, at p. 51 :

In order to set aside the will of a person of sound mind, it

is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence.  It must be shown that they are inconsistent with a contrary hypothesis.

Hence, in Thompson v. Kyner, 65 Pa. 368, at p. 380, an offer to show certain facts in support of an allegation of undue influence was held to have been properly rejected, because they were not "inconsistent with testamentary capacity or entire independence."

It has been so often declared that it would be foolish to attempt a citation of the authorities that the proof or admission of the due execution of a will is the proof or admission also of the testator's testamentary capacity at the time.  Testamentary capacity means the possession of a clear conception of what one is doing and who one's heirs are, of the property one has, and of the disposition one is making of it: McCormick v. McCormick, 194 Pa. 107, 111.  Whatever may be the difference in the manner or burden of proof as to undue influence between the case of a stranger to the testator's blood and that of a relative—and there is no difference between them in respect to what constitutes undue influence—it is clear under the authorities that neither want of kinship, nor the existence of confidential relations, nor activity in drawing the will, nor all of these, can be sufficient to overcome the denial of undue influence by the proponent and his explanation of the attendant circumstances, where not only testamentary capacity is conceded but there is nothing in the case to suggest any bodily or mental weakness or infirmity on the part of the testator creating a susceptibility to influence, which, though short of incapacity, may yet be enough to render it probable that the disposition made of his estate was the act of some one else dominating his will, that person being pointed out by the intrinsic evidence furnished by the instrument itself.  The decisive weight of the presence or absence in the evidence of something indicative of such weakness or infirmity in a case of that description is emphasized by a long and uniform line of decisions.  It is indicated in Boyd v. Boyd, 66 Pa. 283, at p. 293, in the assertion that where the beneficiary has no claims of lawful relationship:

General evidence of power exercised over the testator, es-

pecially if he be of comparatively weak mind from age or bodily infirmity, though not to such an extent as to destroy testamentary capacity, will be enough to raise a presumption. . . . Particularly . . . . when the party to be benefited stands in a confidential relation to the testator.

This decision is explained in Frew v. Clarke, 80 Pa. 170, at p. 180, as " predicated of general evidence of power exercised over a testator of comparatively weak mind," and it is there asserted squarely, as applying to a beneficiary who was a stranger to the testator's blood, that—

If the mental capacity of (the testator) had been impaired; if he had become weak from age or bodily infirmity, although not to such an extent as to destroy his testamentary capacity, it might have shifted the burden of proof and required the (beneficiary) to negative, by evidence, a presumption of undue influence.

In Cuthbertson v. Yardley, 97 Pa. 163 (and the decision between the same parties in 108 Pa. 395, involves the same elements), Yardley, a conveyancer often employed by and a personal friend, not a relative, of Neill, had drafted a codicil to the latter's will giving to himself the residue of the estate, there being evidence that Neill had had at least two, possibly three strokes of paralysis, which had left him in a partly crippled and debilitated condition. After declaring the entire consistency of Frew v. Clarke, supra, with Boyd v. Boyd, supra, the court restates the principle of the latter decision thus:

Where the alleged testator is shown by evidence to be weak in mind, whether arising from age, bodily infirmity, great sorrow or other cause tending to produce such weakness, though not sufficient to create testamentary incapacity, and the person whose advice has been sought and taken receives a large benefit under the instrument propounded as a will, it must be shown affirmatively that the alleged testator had full understanding of the nature of the disposition contained in it.

And the case is decided, at p. 173, upon the ground that— it cannot be disputed that there was evidence . . . . that the testator was not the same man physically and intellectually when he executed the codicil as when he made the original will. . . . . Then the onus was thrown on Yardley to prove that Neill fully understood the value of his property, etc.

In Wilson's App., 99 Pa. 545, the testator when in undoubted health had made a will leaving his property to his relations. When in great age and suffering from great infirmities he made another, radically different, through the procurement and instrumentality of a trusted friend and adviser to whom a substantial benefit was given. Referring to this, to the changes made and to the confidential relations proven, Mr. Justice GREEN, says, at p. 549 :

In view of these facts, and of the great age and physical infirmity of the testator, we cannot doubt the propriety of an issue to determine whether undue influence was exerted to produce the will in controversy.

Then comes Harrison's App., 100 Pa. 458, where a testator eighty years old, but mentally and physically vigorous, had left the bulk of his estate to one daughter, in a will drawn by her husband, who was his confidential adviser and named as trustee and coexecutor, Judge ELWELL, whose opinion refusing to send the case to a jury is adopted by the Supreme Court as its own, says p. 470, citing a New York decision :

No case has gone so far as to overthrow a will duly executed, when it was shown that the party executing it was of sound mind and clearly understood its contents, though it was drawn by the person taking the estate.

Next, in Caldwell v. Anderson, 104 Pa. 199, the law is thus summarized, at p. 204.

Where the testator is shown to be of weak mind, without regard to the cause or causes from which that weakness has arisen, though it be not sufficient in itself to wholly destroy testamentary capacity, and the person by whom, or under whose advice, the will has been written, being a stranger to the testator's blood, receives a legacy or bequest, large as compared to the testator's estate, the burden of proof shifts from the contestants to the proponent of the will. In such case not only must testamentary capacity be affirmatively proved, but it must also be shown that the testator acted with a full knowledge of the value of his estate.

In Yorke's Est., 185 Pa. 61, a spinster of eighty-six, with impaired vision, but alert and of clear understanding, executed in favor of one of her nieces a codicil drawn according to testatrix's instructions by the niece's husband who was testatrix's

confidential adviser, and who was not present at its execution. An issue devisavit vel non was refused by the orphans' court of Philadelphia, President Judge HANNA saying (see p. 70):

The rule that the burden of proof is upon the confidential adviser who prepared the will under which he or members of his family take the bulk of the estate or substantial benefits, to the exclusion of children or next of kin of the testator, is applied where the testimony is conflicting as to the mental capacity of the testator, either from the effects of old age, disease, mental impairment or intemperate habits, and the confidential adviser is a stranger to the testator, or a near relative who has acted in the procurement of the will in his or her favor to the exclusion of others equally entitled, is shown to have exercised a controlling influence over the mind of the testator. But not so, when the testator is proved to possess full and entire testamentary capacity, even though, to some extent, enfeebled by the infirmities of age. In such case, even although the will be prepared by the confidential friend and adviser, and he or members of his family are bequeathed the whole or larger part of the estate, and he be made executor, the presumption of the validity of the will and disposition made by the testator is in accordance with his voluntary and uncontrolled wish and desire still exists.

The decision of the orphans' court was approved by the Supreme Court.

Again, in Logan's Est., 195 Pa. 282, where a son who was his mother's attorney in fact procured the scrivener to write her will from data furnished by the son, was made the principal beneficiary, and concealed that fact from his sister, the contestant, Judge STEWART, upon whose opinion the decree refusing an issue was affirmed, says at p. 289—

Where . . . . the charge is that undue influence was exerted upon a mind healthy, strong and free, nothing short of direct proof will avail, and it must be clear and convincing.

Similarly in Friend's Est., 198 Pa. 363, a contest over a will largely preferring a son who was his mother's trusted and confidential agent, the fact of her faculties appearing unimpaired was emphasized as a controlling ground of the decision that there was no evidence of undue influence. And so, on the

contrary, in Robinson v. Robinson, 203 Pa. 400, 422, 425, evidence of weakness is dwelt upon as significant in leading to the opposite conclusion.

In McEnroe v. McEnroe, 201 Pa. 477, the chief beneficiary in the will of a testator who had nephews and nieces was a second cousin, a Roman Catholic priest, between whom and the testator there had been a long and close friendship; who, during testator's last illness, had visited him, asked him whether he had made his will, and receiving a negative reply advised him to do so; and who at testator's solicitation thereupon wrote down the outlines of the will, from testator's dictation, from which an attorney previously unknown to the beneficiary prepared the will and had it executed. At p. 482, Mr. Justice DEAN, after conceding for the purposes of the case the existence of a confidential relation, says:

Here one of the most significant facts tending to show undue influence is wholly absent; there was no impairment of mental powers, no clouding of intelligence.

Finally, in Hook's Est., 207 Pa. 203, which was the case of a preference of children who had been attentive to the testatrix in her old age, and one of whom occupied a confidential relation towards her as attorney and business agent, the chief justice says on the subject of undue influence:

To set aside a will on this ground, where the testator is in full possession of his faculties, and his testamentary capacity admitted or established, the evidence must be clear and strong. Mere opinions or suspicions or belief not founded on facts testified to will not be sufficient.

In this connection it may be observed that the mere age of a testator does not prove the weakness referred to, as is explicitly ruled in Thompson v. Kyner, 65 Pa. 368, where Mr. Chief Justice THOMPSON says, at p. 380:

The (contrary) theory of the plaintiff's case rests on a presumption from a presumption, which is not allowable, namely, that the testator, being an old man, must be presumed to have been weak, and therefore it is to be presumed that the defendant, who was taking care of his farm and was an active-minded man, coerced his will.

As already noted, there is conspicuous in this case an absence of anything that would indicate any weakness or infirm-

ity in the testatrix, whilst on the other hand there is strong evidence of her perfect understanding of what she was doing and of her mental and physical ability both to will and to do. Half a year or more before she made any testament she had decided against the contestants as to anything beyond the house she lived in or an equivalent of its value in money. Holding on to that purpose, that is what she gave them in the first will she made, gave them again in the second, and finally gave them in the will in controversy. All the wills were written under her personal direction as to every detail. They were in her possession before and after execution during nearly the whole of a period of three years. During this time, twice in having them rewritten, three or four times by the addition of codicils in her own hand, she reaffirmed the disposition she had originally made in favor of the proponent. She repudiated the insinuation that any one had influenced her in any part of her determinations, and instead of ever complaining of their tenor or of her relations with the proponent or his family, she repeatedly expressed her intense satisfaction over both. If, as is profoundly remarked in Robinson v. Robinson, 203 Pa. 400, 425, thwarted weakness is evidenced by complaints accompanied by inaction, it must also be true that uncontrolled freedom of action is shown by an absence of complaints re-enforced by positive expressions of satisfaction and acts unequivocally indicative thereof. The testatrix's expressions and acts just referred to are certainly such. If the conveyance of her house, the transfer of her bank stock, and the gifts of money to the proponent after the determination to make him the residuary legatee had been fixed upon paper may not fairly be looked upon as acts of this kind (though in view of the testatrix's abhorrence of the collateral inheritance tax law—of the suggestion made to her by her legal adviser and others of the possibility of avoiding it by giving her property away—and of the fact that she continued in undisturbed possession of the house and enjoyment of the income from the stock while she lived, they would seem to tend that way)—yet the most that can be said of them favorably to the contestants is that they are equally open to a contrary interpretation; which is not enough to give them the force of evidence of undue influence. It has been laid down that there is no rule of law or morals which will prevent clergy-

men from receiving gifts, great or small, from their parishioners : Greenfield's Est., 24 Pa. 232, 240. But the conclusiveness of these transfers in a proceeding in equity between the donor and the donee, is not the test of their evidential effect in this proceeding. Conceding that in the former a legal presumption of invalidity would have arisen against the donee, that circumstance cannot here be made the basis of a finding of undue influence in the execution of the will as a matter of fact. An inference of fact can surely not be based upon a legal presumption which, while it stands, stands in the place and ignores the question of fact. When this matter of gifts is eliminated as one at least as capable of militating against as in favor of the contestants, what is there left of the case undisposed of by the admitted fact of testatrix's testamentary capacity, and the indisputable one of her freedom from any such weakness as would render her liable to be imposed upon ? There is nothing in the testimony of the draftsman of her wills or of any witness, or in any remembered saying of the testatrix to show that proponent had suggested any provision embodied in them favorable to himself or his family or any one he was interested in, or in any way taken advantage of his confidential relation with her, conceding that character to the relation existing between them. His own testimony is emphatically that he had not, and he stands uncontradicted. To say that the jury might nevertheless have presumed the contrary, is to say that a presumption against the evidence may be made the foundation of a valid finding of fact, which cannot be : Hays v. Hays, 6 Pa. 368, 370. There is not only no indication that she did not fully understand what she was doing when she made her successive wills (as there was in Scattergood v. Kirk, 192 Pa. 263), but the evidence is uncontradicted, and most of it unimpeachable by contestants, that she was fully able to understand it, carefully pondered it, did understand it, knew it by heart, expressed her satisfaction over it, and persisted in it for three years knowing that it in a large measure excluded and would disappoint her relatives. Suppose she did, the evening before she died, let fall some vague expressions to one of the witnesses which the latter construed as evidencing a doubt as to the propriety of what she had done. At the most the witness's statement was only one of opinion, or suspicion, or belief,

and therefore unavailing as proof (see Hook's Est., supra), as is also the assertion by certain other witnesses that after Florence Ball's arrival testatrix was not as free to go about and converse as she had been—an imputation explicitly denied and not borne out by anything tangible in the evidence. Besides, if testatrix did mean to express dissatisfaction with something she had done, nobody can tell what portion of her testamentary disposition she had in mind, if any. And finally, the inquiry here is as to her free agency, her real and uncontrolled intention at the time of the execution of the will in controversy.

There remains the so-called unnaturalness of the will, and of the entire conduct of the testatrix in relation to her property—the fact that by gifts and by testamentary disposition she deprived her nearest relatives of the succession to so large a proportion of her estate in favor of one who is a stranger to her blood. The argument has' a legitimate basis, but it is a weak one at best. Says Mr. Justice PAXSON, in Cauffman v. Long, 82 Pa. 72, at p. 77.

The growing disposition of courts and juries to set aside last wills and testaments, and to substitute in lieu thereof their own notions as to what a testator should do with his property, is not to be encouraged. No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of it. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. In many instances testamentary dispositions of property seem harsh, if not unjust, the result perhaps of prejudice as to some of the testator's kindred, or undue partiality as to others. But these are matters about which we have no concern. The law wisely secures equality of distribution where a man dies intestate. But the very object of a will is to produce inequality, and to . . . . reward those who have been affectionate, and to punish those who have been disobedient. It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements. This is due to the imperfections of our human nature. It must be remembered that in this country a man's prejudices are a part of his liberty. He has a right to them ; he may be

unjust to his children or relatives; he is entitled to the control of his property while living, and by will to direct its use after his death.

A testator is not bound to furnish a reason satisfactory to others for what he has done or is doing with his own. But in this case a sufficient reason lies upon the surface. The testatrix was an old woman practically alone in the world. She had relatives; but some of them she seems not to have had anything to do with—some of them she did not like—some of them she thought had already had more from her than was their due. It does not appear that she forgot their existence; for her will contains a long list of small bequests in the nature of remembrances. Beyond that she did not feel under obligations to them. It is not unnatural to give or leave the bulk of one's property to those with whom one associates and whom one likes, rather than to those one rarely sees or disapproves of. The testatrix's friends were certainly nearer to her than most of her relations. Then, too, it is one of the legitimate uses to which a person in the situation in which the testatrix was may put her means, to secure herself such environment, such attentions as are acceptable to her. If thereby her happiness and comfort are increased, it is perhaps difficult to conceive in what way more satisfactory to her she could employ her money. It is as clear as can be from the evidence in this case that the testatrix found exceeding great pleasure and contentment in her relations with proponent and his family and in the attentions they bestowed upon her, and that she was very fond of these people. If prompted by a feeling of admiration for proponent and affection for his family, or by a sense of gratitude for kindnesses received at their hands, or by a shrewd desire to insure their continuance, she saw fit to present the proponent with part of her estate (her enjoyment of her home and income not being thereby interfered with) and to assure him, by a will whose provisions he was acquainted with, a portion of the remainder upon her death—it would be a bold thing to say that she was doing that which was unnatural from her standpoint, or that her judgment was at fault or her choice constrained. Indeed, in the absence of any evidence of mental or bodily weakness inconsistent with the assumption of a conscious motive freely acted upon, all this ap-

pears ill-calculated to base an inference of undue influence, but rather tends the other way.

It would serve no useful purpose to prolong this discussion by a detailed consideration of the cases relied on by contestants. Of the Pennsylvania cases some, indeed, have already been referred to. The remainder relate to questions arising in proceedings involving gifts inter vivos, the principles controlling of which are admittedly not identical with those applicable to testamentary dispositions. The cases gathered from other jurisdictions, however respectable, in which, as to such, different rules obtain from those settled in this state are, of course, not authoritative here.

In view of the fact that this issue was sent over by the orphans' court after a hearing at which the testimony appears to have been given by substantially the same witnesses in substantially the same way, the power to direct a verdict was exercised with extreme reluctance and only under the pressure of a constraining sense of duty. It is, however, proper to note that, as gathered from statements of counsel, in the presentation of the case in the orphans' court, the relation of the most material witnesses to the respective parties was reversed, and therefore the range of inferences capable of being contended for by contestants much wider and the question of credibility much more important. A painstaking re-examination of the case as here presented has led to the conclusion that, whilst some of the principles involved were perhaps not apprehended with entire accuracy, the direction of a verdict for proponent was imperative. Conceding that upon him was the burden of explaining whatever was left unexplained by witnesses called by contestants, yet his comprehensive explanation of the circumstances and denial of wrong, under oath, supported in most of the significant details by the witnesses referred to or by witnesses called in his behalf, and in others corroborated by undisputed facts, must, under the decisions cited, be accepted as discharging that burden in the absence both of direct proof of undue influence actually exercised by proponent, and of a presumption thereof arising against him from something in the evidence indicating weakness or infirmity in the testatrix.

The rule to show cause is discharged.

434    CAUGHEY, Appellants, *v.* BRIDENBAUGH.

*Error assigned* was in giving binding instructions for defendant.

*William Kerper Stevens,* of *Stevens & Stevens,* for appellants.

*Jefferson Snyder,* of *Snyder & Zieber* and *Isaac Hiester,* with them *C. H. Ruhl,* for appellee.

PER CURIAM, March 14, 1904 :

This judgment is affirmed on the opinion of the learned judge of the common pleas.

---

## Mease, Appellant, *v.* United Traction Company.

*Negligence—Street railways—" Stop, look and listen "—Contributory negligence—Nonsuit.*

In an action against a street railway company to recover damages for personal injuries sustained at a crossing, a nonsuit is properly entered where the plaintiff's own evidence shows that when at the building line of the street he looked for a car, and saw one a block away, about 480 feet, approaching the crossing; that he drove slowly twenty-eight feet to the track and looked a second time when his horse was on the track, or about to step on it, and saw the car at the middle of the block, and that he drove on at a slow walk, and the front wheel of his wagon was struck almost instantly, according to his own testimony, within a half second of the time he looked.

*Evidence—Mingling of relevant and irrelevant matter—Practice, C. P.*

When an offer of evidence contains relevant and irrelevant matter and is made as a whole, the judge is not bound to separate the good from the bad but may reject it all.

Argued February 29, 1904.    Appeal, No. 39, Jan. T., 1904, by plaintiff, from order of C. P. Berks Co., March T., 1903,. No. 49, refusing to take off nonsuit in case of George Mease v. United Traction Company.    Before FELL, BROWN, MESTREZAT, POTTER and THOMPSON, JJ.    Affirmed.

Trespass to recover damages for personal injuries.    Before ENDLICH, J.

The circumstances of the accident are stated in the opinion of the Supreme Court.