Argued October 3, 1949.
On April 6, 1948, Mrs. Mary C. Freeman, age 71 or 72, presented to the Municipal Court of Philadelphia a petition to adopt Thomas Roland Russell, age 33. A hearing was had on April 23, 1948, and the Municipal Court of Philadelphia entered an adoption decree on June 16, 1948. Mrs. Freeman died September 21, 1948, some three months thereafter. Her will gave practically all her estate to Russell and also exercised certain powers of appointment in his favor. She was a woman of means, possessing an estate of some $300,000, in addition to the powers of appointment mentioned. At her death she was survived by her sister, Bertha C. Grubb, who died testate on November 19, 1948.
On January 5, 1949, the executrixes of Bertha C. Grubb presented a petition to the Municipal Court of Philadelphia, praying that the adoption decree be vacated as procured by undue influence practiced on Mrs. Freeman by the adoptee. On the rule to show cause, the respondent, Russell, filed an answer on the merits, and at the same time moved to dismiss as if on demurrer. The court below held the averments of the petition were insufficient, and discharged the rule. The petitioners then appealed.
The principal reason given for the dismissal seems to be that the averment of "undue influence" or "domination" (practiced by Russell on Mrs. Freeman) was merely a conclusion without any supporting facts.
The motion to dismiss the petition to vacate admits, for purposes of argument, all facts pleaded and the reasonable inferences therefrom.
In Quein Will, 361 Pa. 133, 146, 62 A.2d 909, it is stated:"But undue influence may be established by circumstantialevidence . . . [and it] is so intangible and illusive that it can be rarely proven by . . . testimonial or direct evidence." And in Freed's Estate, 327 Pa. 572, 577, 195 A. 22, Mr. Justice STERN, speaking for the *Page 593 
Supreme Court, stated: "While undue influence is subtle, intangible and merely psychic in its effects, so that its existence cannot be detected, weighed or measured by instruments of science, nevertheless human experience can — and in a case such as the present must — recognize it as the causative factor which linked the execution of this highly unnatural will to the circumstances preceding and attending it, and in which appellant, the sole beneficiary, played such a ruthless and dominating part." See also Caughey v. Bridenbaugh,208 Pa. 414, 424, 57 A. 821.
In pleading that a document was executed because of undue influence, the pleader can only aver the conditions which enabled one party to dominate the will of the other; the means employed; the acts done; the opportunity, purpose and intent; and the resultant effect. That the one party was improperly influenced is simply a conclusion flowing from the facts. It is much the same as in a civil pleading, where the pleader alleges that the defendant did certain acts with "intent to defraud"; or "maliciously" caused a breach of contract. In such cases these are but labels to describe a state of mind. Whether one was "influenced" depends on the mind or will of the victim, and the word "unduly" is but a relative term. As we have seen, it may be established by circumstantial evidence, and is intangible and illusive and can rarely be shown by testimonial or direct evidence.
Possibly the best way to test these pleadings is whether, on a trial of the merits, a decree against Russell could be sustained if he admitted on the witness stand every fact averred in the petition, but merely denied that he used "undue influence" upon or "dominated" Mrs. Freeman. With this approach we recite the facts pleaded, using, however, personal pronouns instead of the adoptee's name: *Page 594 
1. That Mrs. Freeman became a widow in 1931 and had been living in Paris for many years at the Hotel de Crillon. She was worth approximately $300,000 and had also the right to exercise powers of appointment in certain trusts set up by her husband. Her annual income was approximately $34,000 per year.
2. That I, age 32, lived in Paris without any apparent means of support and was of a different social environment from that of Mrs. Freeman. I was looking for an opportunity to improve my financial position by the means I afterwards employed in connection with her.
3. That having full knowledge of her affluence, I planned to be, and was introduced to her in August, 1947, with the premeditated intention of giving me an opportunity to establish a relationship with her, so that I could acquire substantially all of her property.
4. That I knew she was suffering from a serious heart impairment which would be worsened by overexertion or undue self-indulgence, and that I then engaged in no other occupation except to pursue a course of conduct calculated to cause Mrs. Freeman to become infatuated with me, with the purpose of making it impracticable for her to resist my financial demands.
5. That I next induced Mrs. Freeman to engage in various activities which were injurious to her health, as a result of which her health became worse, necessitating her virtual confinement in her apartment, until her departure from Paris to the United States on January 8, 1948, (something more than four months after I met her).
6. That during her confinement in her apartment I was in intimate and daily contact with her and used my position to cause her to execute a will on October 24, 1947, naming me as principal beneficiary; and by the same means extracted from her a promise to adopt me, for the purpose of circumventing any attack upon the will made by her on October 24, 1947. *Page 595 
7. That since such adoption was not permitted under French laws, I urged Mrs. Freeman to return to the United States and make the adoption there. That because of her physical condition she expressed reluctance to make such a trip, but I continued my importunities until she consented; whereupon we came to the United States on January 10, 1948, Mrs. Freeman intending to return to Paris immediately after the consummation of the adoption (having secured a return trip passage effective February 20, 1948).
8. That prior to her departure from Paris her health had steadily declined, and at the time of her departure she was on the verge of a complete physical collapse and not able to make the journey to the United States without detriment to her health and serious risk to her life. In disregard of her condition and welfare I still insisted that the voyage be undertaken without delay, only because I wanted her kept alive until the adoption could be effected, both to prevent an attack upon the prior will and to acquire the major part of her estate.
9. That Mrs. Freeman was seriously ill throughout the entire voyage, and when she reached Philadelphia she had to be placed in the Hahnemann Hospital, where she remained for eight weeks, and until March 23, 1948. During her confinement in the hospital I caused her to execute a will dated February 16, 1948, leaving me a large share of her estate.
10. That after her discharge from the hospital she took an apartment in Philadelphia and her health was in a precarious condition. I occupied the apartment with her except for an interval between May 6 and June 21.
11. That in pursuance of my purpose and design of acquiring the larger portion of her estate I had her execute the petition for adoption.
12. That at the adoption hearing I did not disclose to the court my purpose of securing her estate by this *Page 596 
means, and concealed from the court my influence over her and my lack of affection and respect for her. I did not disclose to the court that I had received substantial sums of money and other property from her, or that upon the adoption being granted I proposed to cause her to make changes in her will to my further advantage. These further testamentary changes to my advantage were subsequently effected by a codicil of July 7, 1948.
13. That Mrs. Freeman protested against making the codicil of July 7, 1948, which gave further property to me, but I overcame her protests by threatening to expose the true relations which existed between us throughout our association.
14. That I had learned that Bertha C. Grubb, who would have taken if the codicil had not been made, was 85 years of age and physically ill, and that a former chauffeur who also would have taken a part had died prior to July 7, 1948.
15. That throughout our association, and as a result of my activities in pursuance of my original design to acquire her property, I occupied a position with Mrs. Freeman which afforded me the means and power to take advantage of her and to exercise undue influence over her.
16. That I occupied a confidential relation with her as shown by my causing her to make me substantial gifts, including jewelry worth more than $22,000, a Lincoln convertible automobile of a value of approximately $6,000, and substantial gifts in cash.
 * * * * * * * * *
We are of the opinion that the averments of the petition require an adjudication on the merits. Whether the allegations can be sustained is another question, to be later determined.
We are also of the opinion that petitioners, the executrixes of the will of Mrs. Grubb, and also personally interested in her estate, are proper parties to the contest, *Page 597 
which in its essence involves the devolution of property. SeeBrindle Will, 360 Pa. 53, 60 A.2d 1; Phillips et al. v. Chase,203 Mass. 556, 89 N.E. 1049, 30 L.R.A. (N.S.) 159; Greeneet al. v. Fitzpatrick et al., 220 Ky. 590, 295 S.W. 896.
The petition to vacate averred the physical infirmity of Mrs. Freeman and the confidential relationship existing between her and Russell. Therefore it is unimportant that there was no averment of any mental weakness of Mrs. Freeman. The absence of the latter averment only affects the burden of proof, passing it to the contestant-executrixes to establish undue influence. If it were averred that the decedent's mind was weakened (and this may be done by amendment) the burden rests upon Russell to establish the absence of undue influence, since the confidential relationship is averred: Quein Will, 361 Pa. 133,146, 147, 62 A.2d 909. See also Wilson Will, 364 Pa. 488,72 A.2d 561.
We are not impressed by appellants' contention that the six months' residence in the family of the adopting parent (under the adoption statute as amended by the Act of 1947, P. L. 1180, Sec. 3, 1 PS Sec. 4) means continuous presence 24 hours a day for six months.[1] Nor do we think that the running of the six months' period is interrupted by Russell making a journey for Mrs. Freeman's benefit and at her request. However, the proof of the occasion of Russell's absence is to be determined on the merits.
The fact that under the pleadings Russell was absent from the country for 40 days (at Mrs. Freeman's request) does not conclusively establish that she was not subject to undue influence for those 40 days. This may or may not be true, and the evidence might show that her *Page 598 
silence during that period was procured by threat or promise or some other form of coercion. This, too, can only be determined after trial on the merits.
Order reversed with a procedendo.
[1] From the history of the amendments to the statute, it may be doubted that the Legislature intended the six months' residence requirement to apply to the adoption of adults.