## Russell Adoption Case.

Argued October 1, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Joseph J. Brown,* for appellants.

*Walter Biddle Saul,* with him *Saul, Ewing, Remick and Saul,* for appellee.

Opinion by Arnold, J., January 17, 1952:

On June 16, 1948, the Municipal Court of Philadelphia entered a decree of adoption of Thomas Roland Russell, now aged 36, by Mrs. Mary Freeman, a widow. Mrs. Freeman died September 18, 1948, and at no time prior to her death was the propriety of her action impugned. Mrs. Freeman, prior to the adoption, and on February 16, 1948, executed a will in which Thomas Roland Russell, described therein as her proposed adoptee, was one of the beneficiaries. After the adoption another will was executed by her, under the terms of which she left her entire estate, and the benefit of certain appointive powers, to her adopted son, Thomas Russell-Freeman.

Mrs. Freeman had a sister, Mrs. Grubb, who apparently knew of her intention to make the adoption.[1] Mrs. Freeman predeceased Mrs. Grubb by two months. The executrices of the latter's will moved to set aside Mrs. Freeman's will for undue influence practiced by Thomas Russell-Freeman, her adopted son. About the same time they also petitioned the municipal court to vacate the decree of adoption, apparently because even if the will of Mrs. Freeman could be set aside, her adopted son would take under the intestate laws. Upon the petition to vacate the municipal court determined the matter on the pleadings and dismissed the petition. On appeal this Court directed that the case be heard on the merits.[2] After hearing on the merits the court below refused to vacate the decree and this appeal was taken by the executrices of Bertha Grubb.

The petition to vacate set forth: (a) that Thomas Russell-Freeman by undue influence had caused the adoption to be had; (b) that he had perpetrated a fraud

---

[1] 87a.

[2] *Russell Adoption Case*, 166 Pa. Superior Ct. 590, 73 A. 2d 794.

upon the court in not disclosing to it things which the petitioners claimed were required.

As to the contention that the adoption was procured by his undue influence, there is nothing in the record to sustain such a finding. In fact the testimony discloses exactly the opposite. Letters written by Mrs. Freeman were introduced by the appellants to show that she was in bad health, but these letters also affirmatively showed that she was possessed of all her faculties, that her mind was unweakened, and that she knew exactly what she was doing. For instance, a letter dated December 27, 1947, was written by her to Theresa H. Walls (one of the appellants in her capacity as executrix), setting forth that she intended to adopt Russell.[3] In a previous letter dated September 22, 1947,[4] she referred to the fact that her counsel, Maurice Bower Saul, was present with her in Paris on the adoption business. She recited how fond she was of him even though "I did give him hell," which is evidence not only of undiminished affection but of an unimpaired will and courage. Her letters, her declarations, the testimony of her counsel, Mr. Maurice Bower Saul[5] (who had represented her since 1914), the testimony by deposition of G. Washington Lopp of Paris, one of her oldest friends; and the testimony of one cousin, Mary Lovett Walker, a beneficiary under prior wills (who testified, in part, that she refused to join in this contest because she knew Mrs. Freeman's wishes and purposes, that the latter was undoubtedly not the

---

[3] 210a. Also in a letter written to Mrs. Walls on July 29, 1948, and approximately 6 weeks after the adoption Russell-Freeman referred to Mrs. Freeman as "mother.": 378a.

[4] 207a.

[5] At first Mr. Saul and her Paris attorney, Stefan S. Szlapka (a member of the Pennsylvania Bar) tried to discourage the adoption.

subject of undue influence, and that "her mind was good . . . was as good as it ever was"),—establish that there was no undue influence, and that such could not have been exerted upon her. At one stage of the proceedings the insinuation was made and denied that Mr. Saul had gone along with the adoption and the drafting of the two wills because he would have been discharged by her if he had not. This again showed what the appellants *actually thought* was the strength of the will or mind of Mrs. Freeman. We are convinced that during her lifetime no one would have had the temerity to question the adoption.

Without any further elaboration, there was no evidence to sustain the charge of undue influence, nor was it shown that her mental faculties were in any way dimmed. If the testimony in the present case had been offered in support of a petition devisavit vel non, such petition would have had to be dismissed. See *Snedeker Estate,* 368 Pa. 607, 84 A. 2d 568, and the cases therein cited. The situation here is a fight over an estate of something like $300,000. Inferentially the claim is made that Mrs. Freeman should have left her estate, or at least the larger part thereof, to Mrs. Grubb or to her cousins who would take under the Grubb will. This loses sight of the fact that Mrs. Freeman had a right to leave her money as she saw fit, and overlooks the fact that after the adoption it was only natural that she leave her estate to her son. Whether it suited her relatives or not, it undoubtedly suited Mrs. Freeman. It is probably true, as the testimony indicates, that the estate of Mrs. Grubb has very little in it, but this fact does not circumscribe Mrs. Freeman in her testamentary disposal. The charge that she lacked mental capacity to make the adoption is unfounded, as is the charge that it was procured by undue influence.

The appellants also take the position that if Thomas Russell-Freeman was a homosexual the adoption decree had to be vacated. We are at a loss to understand this reasoning. While homosexuality is abhorrent, we know of no rule of law that a homosexual has no civil rights. The evidence on this subject, however, leaves much to be desired. The landlord of an apartment rented by one Chanalis testified that he entered the apartment with a pass-key and found. Chanalis and Russell-Freeman in a compromising position. When he was asked to identify the person who was with Chanalis, he identified an absolute stranger. He attempted to cure this by saying that he had never seen Russell-Freeman with his clothes on, although he also testified to seeing him, with his trousers on and at least partially clothed, in the hall adjoining Chanalis' apartment, bewailing that he had lost his lover. The whole transaction was vigorously denied by Russell-Freeman.

We think, also, that it is no fraud upon the court for a proposed adult adoptee not to disclose to the court the various derelictions of his lifetime. No such duty rests upon him. Adoption in Pennsylvania is purely statutory, and the Act of 1925, P. L. 127, as amended, 1 PS §4, provides that if the court is satisfied "that *the welfare of the person proposed to be adopted will be promoted* by such adoption. . . [it] shall make a decree so finding. . ." (Italics supplied). Actually the complaint in this case is that the present adoption is too much for the welfare of the adoptee.

The appellants raise the question that Judge BURCH was disqualified from hearing the case. This was raised in the first appeal *(Russell Adoption Case,* 166 Pa. Superior Ct. 590, 73 A. 2d 794), and this Court made no comment for the reason that there was nothing in the petition showing any disqualification.

Thereafter a petition for a writ of prohibition was filed, and was refused by this Court for similar reasons. Certainly no one is better able to determine whether the court was defrauded than is Judge BURCH.[6] Judge BURCH leaned over backwards to admit all of appellants' evidence even remotely connected with the issues. He repeatedly stated that he only knew what was in the record of the original adoption, and therefore the appellants were not hampered in any way. In addition, since there was no evidence to sustain the charge of undue influence or fraud upon the court, the appellants cannot possibly be hurt by the case being determined by Judge BURCH.

There is only one other question in this case. The adoption statute requires that "In no case shall any *decree* of adoption be made or entered unless the person proposed to be adopted shall have resided with the petitioner for a period of *six months prior thereto* [unless related to the petitioner]": Act of 1925, P. L. 127, as amended, 1 PS §4. (Italics supplied).

In October, 1947 (for the purpose of this opinion October 31, the date not being clear) Russell, at Mrs. Freeman's request and for the purpose of complying with the adoption statute, went to live at the Hotel Crillon where she had resided for many years. He occupied a room on the same floor on which was her apartment, there being no immediately adjoining room available. He was in intimate and daily contact with her throughout the entire period of their residence at the hotel. Considering that Russell was a young man of 32 years and Mrs. Freeman a widow of 71, it is clear that he was a member of her household and was residing with her. They thus continued to reside under

---

[6] In the course of the trial counsel for the present appellants declared in open court: ". . . I have the utmost confidence in your [Judge BURCH's] integrity . . ."

the same roof until January 10, 1948, when Mrs. Freeman took him with her on the ship to America, and on arrival on January 16 they immediately took communicating rooms engaged by her at the Barclay Hotel. Here, again, they lived under the same roof. Their plan of living was the result of a sincere intention to comply with the requirements of the adoption statutes of Pennsylvania.[7] Their residence at the Barclay Hotel continued until her death in September, 1948. Mrs. Freeman had to be hospitalized on January 21, 1948, and returned to the Barclay Hotel on March 23. On April 23, 1948, a hearing was held on the adoption petition previously filed. Mrs. Freeman and Russell both appeared and separately testified at the adoption hearing.

The residence having been once thus established, the hospitalization of Mrs. Freeman did not stop the running of the six months period. See *Russell Adoption Case*, 166 Pa. Superior Ct. 590, 73 A. 2d 794.

Thus when the adoption hearing was had on April 23, 1948, there were lacking at most only 7 days of the six months continuous residence under the same roof, with the exception of Mrs. Freeman's hospitalization, which we repeat does not affect this matter. Certainly one or another member of the household may be physically absent from the joint residence, such as for temporary hospitalization, without stopping the running of the statute. The law is not to be construed unreasonably and thus defeat the express purposes of the Act. The six months residence was completed at the time of the hearing, except for a few days.[8] The decree was

---

[7] One of the witnesses for the appellants, Helen W. deGroat, testified that Mrs. Freeman had told her that "it was necessary for her to live under the same roof with him for six months before he could be adopted." (565a).

[8] See Statutory Construction Act, 46 PS §540.

entered after the week's additional residence was admittedly complied with, to wit, on June 16, 1948.

The word "resided" in the statute must receive a broad construction and not the construction that has to do with election laws or the eligibility for public office. If the adopting parent lives in a one-room apartment, and the adult adoptee is of the opposite sex (and usually much younger than the adopting parent), to say that the adoptee must occupy the same room would be to make such an adoption practically impossible. The purpose of the six months residence clause (if it applies to an adult adoption)[9] is to create

---

[9] In the former case, in its opinion, 66a et seq., the lower court stated:

"Section 7 of the Act of 1855, May 4, P. L. 430, was the first adoption statute in Pennsylvania and related to the adoption of children only. The Act of 1889, May 9, P. L. 168 was the first statute in Pennsylvania relating to the adoption of adults. Thus, prior to 1925 separate laws treated of the adoption of adults and children. The Act of 1925, April 4, P. L. 127, §1, 1 P.S. §1, codified and included the laws applicable to adoption of adult and minor adoptees and designated adoptees as '. . . any person, either a minor or an adult . . .'

"Under Activities of the Committees of Joint State Government Commission, 1945-1947, Legislative Journal for 1947 (Appendix 6169, 70, 71 to the Legislative Journal for 1947), The Committee on Child Welfare Laws, Juvenile Delinquency and Institutions was created to carry out the studies outlined in House Resolution No. 63, 1945, and in Senate Resolution Serial No. 51, 1945, directing the Joint State Government Commission to study the conditions, practices and laws of this Commonwealth relating to child welfare and to children, especially to those which relate to the dependent, defective, neglected, incorrigible, or illegitimate children, or etc.

"On January 15 and 16, 1946, the Committee directed its Chairman to appoint an advisory committee composed of citizens and officials conversant with children's services and needs. Such a committee was appointed in February, 1946. On February 28, 1946, the field of study was divided into five subjects; dependent and neglected children; delinquent children; handicapped children;

a waiting period, and in our opinion does not require common use of a bedroom. Here the adoptee lived under the same roof as did the petitioner, at the Hotel

---

adoptions, illegitimacy, non-support, custody and guardianship, and child marriages; and supervision of institutions, private schools and camps. Subcommittees of the advisory committee were appointed to deal with each of these problems. On February 18, 1947, the Summary Report of the Advisory Committee was submitted to the Commission's Committee for consideration and action.

"The Committee took certain actions on the recommendations of the advisory committee including adoption. The Committee approved, *inter alia*, under recommendations with respect to adoption, EI, (a) to (i) as set forth in said report at page 6171 of the Appendix, *supra*. The Adoption Law (Act of April 4, 1925, P. L. 127, as amended) be amended as follows:

'(g) Require that the person to be adopted shall reside with the adopting parent for six months before the adoption decree is entered, unless such person is related by blood or marriage to the petitioner.'

"An examination of House Resolution No. 63, 1945, discloses that it requests the Joint State Government Commission of the General Assembly to make a thorough investigation, etc., relating to child welfare and to children, etc.; History of House Bills and Resolutions, Session of 1945. An examination of Senate Resolution, Serial No. 51, of 1945, discloses that it directs the Joint State Government Commission to continue its study of penal code, juvenile delinquency, and institution. History of Senate Bills and Resolutions, Session of 1945. An examination of the legislation in its passage through the House and Senate discloses that the bill when introduced on March 17, 1947, amended the Adoption Act and that bill defined the proposed adoptee as 'person' and that the word 'person' remained in said Bill until its final passage on April 9, 1947, and approval by the Governor.

"Obviously it was the intention of the Commission, and that intent was subsequently carried out by the enactment of the amendment by the Legislature, that the word 'person' as used therein should apply to minors only and not to adults. A provision of a statute must be construed with reference to the object intended to be accomplished by it, and this is so even to the extent of restraining the meaning of general terms in order to clearly interpret the spirit and reason of the statute. Null v. Staiger, 333 Pa. 370,

Crillon, on the ship from Europe to America, and at the Barclay Hotel. Under the circumstances of this case the requirements of the statute were satisfied.

Decree affirmed, at costs of the appellants.

---

DISSENTING OPINION BY DITHRICH, J.:

I dissent from the majority opinion for the reason that the record fails to show substantial compliance with the statutory provision that "In no case shall any decree of adoption be made or entered unless the person proposed to be adopted shall have resided with the petitioner for a period of six months prior thereto, . . ."

The majority opinion states: "The purpose of the six months residence clause . . . is to create a waiting period, and in our opinion does not require common use of a bedroom." No one contends that it does. The opinion continues: "Here the adoptee lived under the same roof as did the petitioner, at the Hotel Crillon, on the ship from Europe to America, and at the Barclay Hotel." While the statute "does not require common use of a bedroom," a closer relationship than life "under the same roof" is contemplated. In my opinion, in prescribing the six months' residence requirement prior to the entry of a decree, the Legislature intended that the adopting parent and the person—no distinction having been made between a child and an adult—to be adopted should live together in the same household in a family relationship during the required period of time. Residence "under the same roof" at

---

376 (1939). To understand and to construe a statute its history may be resorted to as a guide. Miles's Estate, 272 Pa. 329 (1922). In construing a statute it will be presumed that the Legislature intended what is reasonable and effectual, and not what is productive of absurd or anomalous consequences or is impossible and incapable of execution. Driskel, et al. v. O'Connor, et al., 339 Pa. 556, 563."

the Crillon Hotel in Paris, where the adoptee was at liberty to continue his relationship with one Chanalis, was not in compliance with the statutory requirement. Nor was the period from May 5, 1948, until June 22, 1948, six days after the entry of the adoption decree —during which period Russell was in Paris, ostensibly for the purpose of arranging for the termination of the lease of Mrs. Freeman's apartment at the Crillon—in compliance with the requirement.

It is significant that when Russell arrived at the Crillon on May 6, 1948, he met Chanalis and roomed with him in Paris until they both left for the United States on June 9. While Russell was living at the Barclay with Mrs. Freeman, Chanalis occupied an apartment at 317 South 17th Street, within a short distance of the Barclay. Russell visited the apartment daily.

To my way of thinking it is preposterous to assume that Russell or Russell-Freeman could enter into a family relationship with Mrs. Freeman and, at the same time, continue his relationship with Chanalis.

The law of adoption in Pennsylvania being entirely statutory, strict compliance with the statutory requirement must be followed. *In Re: Adoption of Margaret Nolan,* 113 Pa. Superior Ct. 198, 172 A. 477.

RHODES, P. J., and HIRT, J., join in this dissent.