MARGARET E. WOOD, ET AL.,

*vs.*

JOHN H. HANKEY, ET AL.

*Testamentary capacity: legal standards; personal eccentricities or oddities.   Non-experts: opinions; should state facts on which conclusions are based.*

In determining a question of testamentary capacity, the legal standard is not according to the theories of speculative specialists, but has to be determined by whether or not the testator at the time of executing the will was possessed of sufficient capacity to make a disposition of his estate with judgment and understanding, in reference to the amount and situation of his property and the relative claims of the different persons who should have been the objects of his bounty.                    p. 390

If a testator has capacity enough to make a valid deed of conveyance or an ordinary contract, he has capacity enough to make a valid will.                                        p. 391

Mere eccentricities, peculiarities or oddities of life do not amount to testamentary incapacity.                       p. 396

Non-expert witnesses should not be allowed to give their opinions without showing that they were acquainted with the facts, and they should also state as well as they can the facts which led to their conclusions.                      p. 397

*Decided December 12th, 1918.*

Appeal from the Circuit Court for Frederick County. (WORTHINGTON and PETER, JJ.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER and CONSTABLE, JJ.

*Milton G. Urner, Jr.,* and *Jacob Rohrback* (with whom was *Harvey L. Spessard* on the brief), for the appellants.

*Alfred J. Shriver* and *Edward J. Smith* (with whom was *Frank L. Stoner* and *W. Clinton McSherry* on the brief), for the appellees.

PATTISON, J., delivered the opinion of the Court.

The sole inquiry in the trial of this case in the lower Court was whether George E. Hankey, late of Frederick County, deceased, had at the time of the execution of the paper writing purporting to be his last will and testament the mental capacity to make a valid will.

At the conclusion of the plaintiff's testimony the Court, at the request of the defendants, instructed the jury that no evidence legally sufficient had been offered "to show that George E. Hankey, at the time he executed the will, dated December 30th, 1874, offered in evidence, was not of sound and disposing mind and capable of executing a valid deed or contract"; and thereupon the jury returned a verdict for the defendants.

The main question presented by this appeal arises from the action of the Court in granting this instruction.

In the *Berry Will case,* 96 Md. 49, where the same question was presented, and where the evidence was not submitted to the jury, this Court, speaking through JUDGE MC-SHERRY, said: "We are not dealing with the question of sanity or insanity, whatever that mysterious malady called insanity may be, according to the theories of speculative specialists, the law, in the administration of justice both in civil and criminal proceedings, has its own standards of mental capacity and responsibility, and to those standards judicials tribunals must look and by them they must be governed, when dealing with questions of the character now before us. By the legal standard he who is possessed of sufficient capacity at the time of executing his will to make a disposition of his estate with judgment and understanding in reference to the amount and situation of his property and the relative

claims of the different persons who should have been the objects of his bounty, is mentally competent to make a valid will. *Davis* v. *Calvert,* 5 G. & J. 269; *Jones* v. *Collins,* 94 Md. 408. In a word, if he has capacity enough to make a valid deed of conveyance or an ordinary contract, then he has capacity enough to make a valid will."

George E. Hankey died December 20th, 1915, age sixty-six years.

The alleged will was executed December 30th, 1874, more than forty years before the death of the testator, when he was about twenty-five years of age. The record discloses that at that time his estate was valued at about six thousand dollars ($6,000) and when appraised after his death, its value had increased to twenty-four thousand two hundred and seventy-nine dollars and thirty-four cents ($24,279.34). His estate was at all times under his control and management and under his management it was quadrupled within the period of forty years.

George E. Hankey left no father or mother and no children or descendants. The caveators are his nieces and nephews, some of whom he had never seen and with none of them was he on intimate relations.

He, by his alleged will, devised and bequeathed his estate as follows: To his executor the sum of one thousand dollars ($1,000) "In trust for the children of Henry Hankey, a brother; and upon the marrige of said children or either of them, to pay over to them who shall so marry their respective share or shares of said legacy," etc.; to Sabina C. C. Foster (a sister), the sum of one thousand dollars ($1,000); to his executor, one thousand dollars ($1,000), in trust for the children of John Hankey, a brother; to Woodstock College in Baltimore County, Maryland, the sum of twelve hundred dollars ($1,200), in trust for Williamina Hankey, a sister, for and during her natural life, and upon her death to Woodstock College absolutely; to Reverend John Gaffney, the sum of five hundred dollars ($500); to his executor, in trust, for William T. Burkhart, five hundred

dollars ($500), the interest thereon to be paid to him for and during his natural life, and upon his death to the Reverend John Gaffney absolutely; to each of fifteen friends the sum of fifty dollars ($50); and to St. Mary's Orphans Asylum of Baltimore City the rest and residue of his estate with a provision, that in the event of any legacy ·or bequest lapsing, or failing to vest by reason of the legatee or devisee being incapable in law of taking, holding, or receiving the same, that it should go to and "vest into 'St. Johns Literary Institution,' a body corporate of Frederick City, Md."

The will directed his executor to enclose with an iron fence the grave of his mother and to erect a tombstone at the testator's grave similar to that marking his mother's grave.

Clinton Willard, a merchant of Frederick with whom George E. Hankey dealt for fifteen years, testified that "Hankey knew the price of things, and would ask the price of produce, such as eggs and butter, and what was paid for them"; that on one occasion witness went to see him and asked him to loan some money to a friend and he told witness that he did not know the party, but if witness would endorse a note, he would loan it to him.   This witness did, and the money, seventy dollars ($70), was loaned as requested.   He further testified that in his opinion Hankey was capable of making a valid deed or contract.

Harry C. Frye, a tenant upon Hankey's farm, testified that the deceased knew how to take care of himself "a good deal better than he could the other man."   When asked if he was not a hard fellow to beat in a deal, he replied, "I never tried to beat him, but I suppose he would have been."

Charles D. Hickman, a merchant at Doub's, Frederick County, Maryland, with whom Hankey also dealt for twenty years or more, and where he ran an account, testified "he knew how to pay me, was very particular about the pay part. He would try to get me to knock off a few pennies.   He could take care of himself in small deals of that kind."

Dr. Charles H. Conley, who had known Hankey about seventeen years, and had attended him in his last illness, as

well as on one or two other occasions, and who also had attended a member of his family in the year 1908 or 1909, testified that Hankey during his last illness told him that he, in the winter of seventy-four or seventy-five had executed a will drawn by Judge McSherry; that the will had been lost, mislaid or stolen; that he had placed it in "A certain room or closet" in his home "and both he and Miss Hester Geisbert (who lived with him) had hunted for it, and that he was of the impression that it had been stolen by members of his family." It was in this closet or room that the will was found after his death.

Dr. Conley's first visit to him, in his last illness, was on the 17th or 19th of October and he continued his visits until the day of his death, paying him in all, at such time, about forty visits.

In a conversation with witness, Hankey told him "that he had left his property to a number of charitable institutions," one of them was in Frederick City, but he was of the opinion that some of those institutions "had gone out of existence." Witness suggested to him that "in all probability if the parties who had stolen the will, as he expressed it, had it, that they would wait until his death, then probate the will." He replied saying: "Oh, no, it is not in their favor."

He then spoke of making a new will, saying that he wanted his estate to go "as far as he could just as he had left it in the prior will, with the exception of some of these institutions that he thought were out of existence," for them he wished to substitute other institutions. He, however, put off making it. "The day of his death his mental caliber was as keen as it ever was. He spoke of the will that day but he wanted to wait until he was strong. He could not realize that he was a dying man, did not want to realize it."

Dr. Conley further testified that he had many conversations with Hankey and found that "He had an unusually intelligent mind, a man I might say of rather strong personality, exaggerated personality, but a man of strong mentality." He was quite a reader and read magazines that he

carried him. In one of these was an article upon "International Conditions," this he read and discussed intelligently with witness. He took the daily papers, among them was a German paper, whether he could read it witness could not say, but he knew that he could speak German. The doctor then testified in reply to a question propounded· by the Court that assuming his mental condition and capacity was the same on December 30th, 1874, as it was at the time he knew him and attended him as his physician, he was, in his opinion, of sound and disposing mind and capable of executing a valid deed or contract on the 30th day of December, 1874. Other witnesses who knew him at the time of the execution of said alleged will and who continued to know him to the time of his death had previously testified that his mental condition was during the latter years of his life about the same as it was at the time of the execution of the will.

Against this positive and convincing evidence that George E. Hankey had at the time of the execution of the said will mental capacity sufficient to make a valid will is found certain testimony in the record showing that he possessed peculiarities and eccentricities.

The evidence discloses that he owned a farm in Frederick County which he neglected. He permitted the fences and buildings thereon to become decayed and dilapidated; and in consequence of his failure to work and cultivate it, it grew up in weeds and bushes. In this condition he allowed persons to hunt it for rabbits for a consideration of one dollar a day, saying that he could get more out of the place in this way than by having it cultivated. He had horses that he never worked or used except occasionally to ride them to the stores or other places in the neighborhood; and on some of these occasions he would be seen, while so riding, with a sack of "provender" on his shoulder, and when asked why he did so said that it was lighter on the horse; at other times, he would be seen leading the horse. The horses were cared for by Miss Hester Geisbert, the only occupant of his house other than himself. He had some sheep and kept them until they died.

He sheared them and some of the wool was found upon the premises at his death. He kept it, he said, because he was told it grew after being sheared. It was also said of him that he was miserly, that his clothes were shabby and ragged and he would sometimes wear a boot upon one foot and shoe upon the other, and at other times a leather shoe and gum boot, and was also seen at times wearing a woman's poke bonnet. He would walk miles in order to get one or two cents more for his eggs and on one occasion when he needed about six pounds of nails to do some repairing upon the premises, he bought a hundred pounds because in that quantity he could buy them at one half cent less per pound. He would sleep late in the mornings, and when he went from home, which was not often, he generally went at night. This was true of him in his boy-hood days. When he went to the store in the evenings, he would be the last one to leave. He explained that he wore old clothes when travelling alone so as to impress the people that he was worth nothing, and that he went mostly at night as he was afraid of his brother. The witnesses also spoke of the habit he had of counting and recounting money when paid to him, and that after putting it in his pocket, he would pat his pocket to see if it was there, and after being seated would, upon rising, look around to see if he had lost anything. He also had a way of brushing at his clothes, rubbing his face, pressing his nose, rolling up his eyes, and laughing to himself, and when walking, his eyes were cast down. In talking, he would look away from and not toward the person with whom he was talking; and as a boy he was dull at school and seemed to have difficulty in learning.

As was said in the *Berry Will Case, supra*: "Not one of the various incidents contained in the record tended to show that he had not the requisite mental capacity to make a valid will at the time he did make his will. Can it be possible that a combination of all of those incidents will establish a conclusion which no one of them tends to prove? The sum of any number of zeros will always be zero, and this is true

in the law of evidence as well as in arithmetic.. You may combine as many independent circumstances as you please, and if no one of them has any legal tendency to establish the fact to be proved then all of them taken together can have no greater probative value. If each proves nothing, all can prove no more. To assert the contrary is to state that the aggregation of a number of incompetent facts is, by force of that mere aggregation, sufficient to establish a result which no one of the same facts considered by itself has even the remotest tendency to prove. *An. & Balto. Short L. R. R. Co.* v. *Pumphrey,* 72 Md. 87.

Eccentricities, peculiarities, oddities or the like, of them-selves, do not amount to testamentary incapacity. See note to *Slaughter* v. *Heath,* 27 L. R. A. (N. S.) 56 and the cases there cited.

Hankey, forty years after the execution of said alleged will, spoke to Dr. Conley of its provisions, and, at the time, thinking it was lost, talked of making another, and said that he wished such new will, if made, to embrace the same provisions as the old one, with the exception that other institutions should be substituted for those that he thought had passed out of existence. This evidence shows not only that he knew of and understood the provisions of the will, made more than forty years before, but that he still wished to dispose of his estate as he had done by that will, subject only to the exceptions stated above; and his statement that his relatives who were suspected by him of having taken his will would not probate it, "because the will was not in their favor" shows that in making such disposition of his estate by said will the claims of said relatives, as objects of his bounty, were considered by him and that he in disposing of his estate thereunder was fully aware of the fact that the provisions of the will were not "in their favor."

The Court, we think, acted properly in directing a verdict for the defendants, as no evidence legally sufficient had been offered to show that George E. Hankey was not, at the time

of the execution of the will, of sound and disposing mind, and capable of making a valid deed or contract.

The record contains ten exceptions taken by the caveators to the rulings of the Court upon the admission and exclusion of evidence. The third, fourth, fifth, seventh and tenth exceptions were to the rulings of the Court excluding the opinions of non-expert witnesses offered by the caveators, who were not witnesses to the will as to the mental incapacity of the testator to make a valid deed or contract.

In *Brashears* v. *Orme,* 93 Md. 448, this Court said, speaking through CHIEF JUDGE BOYD, that "although opinions of witnesses who are not experts are admissible under proper circumstances, it is a character of evidence that should be very carefully guarded and is liable to do great harm unless it is. * * * A non-expert witness must not only show that he was acquainted with the facts, but he must state the facts, as far as he can, and disclose what has led to his conclusions, and when the whole testimony of the witness fails to show any facts or fact to justify the conclusion reached by him, he should not be permitted to express an opinion."

In each and all of these exceptions the witness failed to meet this requirement. We will not state the facts sworn to by each witness, or discuss the weight and effect of same, because of what we have already said, as to the insufficiency of the evidence, in passing upon the ruling of the Court in granting the prayer taking the case from the jury.

The first and sixth exceptions were to the rulings of the Court in striking out answers of witnesses that the testator did not speak and act as a rational person. These answers were likewise properly rejected as there were no sufficient facts stated by the witnesses upon which to base such opinions.

The evidence excluded in the second exception was afterwards admitted and no harm was thereby done the caveators.

In the eighth exception Dr. Conley was asked, "assuming that the mental condition and capacity of George E. Hankey was the same on December 30, 1874, as it was at the time

you knew him and tended him as his physician, was he or not, in your opinion, of sound and disposing mind and capable of executing a valid deed or contract"? He answered, saying, "he was." The caveators objected to this question and answer. The Court overruled the same and an exception was noted thereto. We find no error in this ruling. The plaintiffs had shown by a number of witnesses, who knew the testator at the time of the execution of the will, and who continued to know him to the time of his death, that his mental condition at the time the will was executed remained the same until his death. The only difference spoken of by them was that one or more of his alleged peculiarities grew more pronounced as he grew older.

The caveator's ninth and remaining exception was to the action of the Court in striking out the statement made by witness, that the testator had said to him that "the Catholics will never hear of reaping one dollar of my money; they didn't treat me right."

This, as witness stated, was laughingly told him in response to his saying to the testator, that he had heard he was "going to will the Catholics some money" and a request that he "will" to him, "a couple of hundred dollars," as he was poor and needed it.

This answer of the testator, trivial in its character, and laughingly and evasively made under the circumstances stated, was not, we think, entitled to serious consideration as reflecting in any way upon the issue and was properly rejected.

The caveatees in the course of the trial of the issues in the lower Court noted a number of exceptions to its rulings and these were certified to this Court under a provision of the Local Laws (2 Code, Art. II, sec. 76), but as the cause will not be remanded for a new trial we need not under its provisions consider or pass upon these exceptions.

As we find no error in the rulings of the Court below they will be affirmed.

*Rulings affirmed and cause remanded.*