# Greer's Executor v. Bishop et al.

(Decided May 8, 1936.)

RODES & HARLIN and L. B. FINN for appellant.

CHARLES R. BELL for appellees.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

This is an appeal from a judgment of the Warren circuit court based on the verdict of a jury finding the paper in contest not to be the will of Miss Elizabeth Greer, deceased, due to her mental incapacity. At the time of her death, about seven weeks after the will was written, Miss Greer was seventy-four years of age. She was a hunchback and of slight build, weighing about a hundred pounds. She suffered from high blood pressure with various of its attending debilities, and from a chronic degenerative disease of the kidneys. Miss Greer had lived for a number of years in a house she owned in Bowling Green, with her widowed sister, Mrs. Pernie Allen. In June, 1933, Mrs. Allen died, and the date of Mrs. Allen's death is claimed by the contestants to mark the point at which testatrix commenced to fail mentally and continued to deteriorate until the date of her death in January, 1934.

Fifteen witnesses were introduced on behalf of the contestants. One doctor testified, and of the remaining fourteen lay witnesses, nine gave it as their opinion that Miss Greer did not have sufficient mind and memory to know the nature and extent of her estate, the natural

objects of her bounty, or to make a rational survey of her estate and dispose of it in accordance with a fixed purpose of her own. The majority of these witnesses admitted on cross-examination that, in their opinion, Miss Greer knew her relatives and knew the nature and extent of her property, but they maintained that she was incapable of disposing of her property in accordance with a fixed purpose of her own. In detailing the facts on which the witnesses based their opinions, it was brought out that Miss Greer frequently cried while speaking of members of her family or sometimes without an apparent reason; that she could not at times control her kidneys or bowels and did not appear to be properly embarrassed on these occasions; that she frequently got up at night and was heard prowling about the house; that her conversation wandered and she would drop one subject and start up on another with no connection; that she took all of the contents out of a trunk and put them on the floor and, when asked why she had done this, said that she did not know; that on several occasions testatrix thought there was some one else in the room, when in fact no one else was there; and that she was in general physically weak and mentally distressed. The doctor who was called in to treat Miss Greer the day following the execution of the will here in contest, and who treated her from that time on until the date of her death several weeks later, expressly limited his opinion to the point that he did not believe the condition of the testatrix was such that she could have had a "fixed and determined" purpose of her own; that a person of her emotional instability would probably have changes of heart and mind; and that she was very easily influenced by extraneous causes. Opposed to this testimony, the propounders of the will introduced nine witnesses, including the two who attested the will and the clerk who had custody of the will, and of these witnesses all who were asked the question gave it as their opinion that testatrix was competent to make a will.

It is frequently overlooked in will contests that testamentary incapacity, where it actually exists, should ordinarily be easily susceptible of proof. Indeed, the fact that it is necessary to labor in the search for facts indicating abnormality in order to find support for the opinions of lay witnesses is itself a strong reason for concluding that mental incapacity does not exist. A perfect intelligence is not prerequisite to an ability to

write a will, but, on the contrary, the cases are legion in which wills of persons distinctly subnormal or abnormal have been sustained. One whose mind is so far disordered as to render him incapable of making a will would almost necessarily display this fact in nearly every action. Incidents showing merely the idiosyncrasies and peculiarities common to many elderly persons fall far short of furnishing a basis for a conclusion of testamentary incapacity even though they may indicate a failing mentality. Middleton v. Skaggs, 263 Ky. 81, 91 S. W. (2d) 1016.

A review of the facts here developed, when considered with the cross-examination of the witnesses who state them, together with the undisputed circumstances, shows quite clearly that there is nothing of substance from which it might reasonably be inferred that the testatrix was without capacity to make a will, except possibly on the question whether or not she could dispose of her property in accordance with "a fixed purpose of her own." Most of the very witnesses who testified concerning the incidents relied on by the contestants as showing incapacity admitted that Miss Greer knew the nature and extent of her property and knew her relatives. We limit the scope of our investigation, therefore, to the sole proposition of whether the evidence that testatrix was incapable of disposing of her property in accordance with a fixed purpose of her own was of sufficient substance to sustain the verdict in the face of the circumstances established.

A diligent search of the authorities has failed to disclose a single case in which an effort has been made to elucidate the meaning of "a fixed purpose" as it is used in the test for capacity to make a will. In Page on Wills (2d. Ed.) sec. 141, the author discusses the standards of testamentary capacity applied in the various jurisdictions. Kentucky seems to be the only state in which the test is applied in this particular form. In running down the Kentucky authorities on this question, the earliest case that we have been able to discover, written in 1830 by Chief Justice Robertson, is the case of Shropshire v. Reno, 5 J. J. Marsh. 91. The court there said:

> "Without recapitulating the evidence, or reasoning upon deductions from it, the foregoing general considerations, with others which need not be

detailed, incline us to the opinion that the testator had not a disposing mind; or that if he even had, it was not in a disposing state. He had not lost all memory, nor all reason. He was not entirely superannuated, nor was he absolutely stultus or fatuus. But all the facts combined tend to show that he had not 'a sound memory,' nor sufficient mind, or a mind in a proper state for disposing of his estate 'with reason,' or according to any fixed judgment, or settled purpose of his own. This we consider the true test, established, not only by philosophy, but by law. * * *

"Without amplifying, we feel authorized to conclude, that the paper of November 1st, 1828, is not 'the will' of Walter Shropshire; or in other words, that it is not the production of a sound mind acting freely, and capable of acting judiciously and independently."

This seems to be the case where the requirement of "a fixed purpose" crept into our decisions. The fact that a will is ambulatory in its nature demonstrates that "a fixed purpose" does not mean an unalterable purpose. Nor do we interpret the opinion in Shropshire v. Reno, supra, as laying down such a requirement. On the contrary, the court parallels its requirement of the testator's "fixed judgment or settled purpose of his own" with a requirement of a mind in a proper state for disposing of his estate with reason. We interpret the test to mean simply that the testator must be capable of producing a document which at the time represents his own will or, examined synthetically rather than analytically, that the testator's mind must be such as to be capable of producing an instrument which is his own, and not that of some one else. The will here in contest is reasonable, and it is not claimed to be the product of any undue influence exercised over the testatrix. Whether or not testatrix exercised her feminine prerogative and changed her mind the next moment, the instrument was plainly her *will* when she executed it. Furthermore, it is shown that after the death of her sister, Miss Greer undertook to persuade a nephew to come to Bowling Green to live with her and take care of her, and that she planned to leave her estate to this nephew in consideration of his care and attention. When the nephew declined to come, another sister, with her husband, came to live with Miss Greer; but the arrangement was not

congenial, and a will which she had made in favor of this sister was revoked when the will here in contest was written. Miss Greer discussed with a niece the problem of disposing of her estate after the arrangement with her sister had proved unsatisfactory. This niece suggested the Church of Christ Home for the Aged, an old ladies' home at Nashville. Miss Greer had apparently never heard of the home before, but seemed pleased with the idea, and insisted on making a visit to the draftsman of her will. After making a bequest of her household furnishings to various persons, her will recites:

> "I wish to spend the evening of my life in the Old Ladies' Christian Home, Nashville, Tennessee, and I will and bequeath all the rest and residue of my estate, real, personal and mixed, to the Old Ladies' Christian Home of Nashville, Tennessee."

Certainly, if a "fixed purpose" means a consistent purpose, the will itself demonstrates a resolution on the part of the testatrix so to dispose of her property that she might be cared for during the last years of her life. This was the basis of her negotiations with her nephew, again with her sister, and finally was embodied in her last will. These facts are not disputed. It is hard to see how a consistent intent could be more thoroughly established.

Had there been proof in this case of any undue influence exerted over testatrix, the evidence introduced for contestants might well be said to show a susceptibility to such influence on the part of Miss Greer. This is as far as it goes. It is not contended that the suggestion by the niece amounted to undue influence. We entertain no doubt from our perusal of the record that the testatrix had capacity to make the will. This is the only question with which we are here concerned, and it follows that the verdict complained of is flagrantly against the evidence and must be set aside.

Judgment reversed.