# Clark et al. v. Johnson et al.

(Decided May 4, 1937.)

L. C. FLOURNOY, FREDERICK P. BAMBERGER, ISADORE J. FINE, BEN D. RINGO and HERMAN HANDMAKER for appellants.

G. L. DRURY and PENTICOST & DORSEY for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

This is a proceeding contesting the will of the late T. J. Shoemaker, an appeal being prosecuted from a judgment on a verdict directed at the close of contestants' evidence.

The testator was left an orphan when very young. He and his brother John had begun to accumulate some property as partners when John married. After living with him a few years, they divided their property and testator went to live alone. He never married and always lived in extreme squalor. What he called his home was but an old shack with the broken window panes covered by boards. He had no bed and slept on a straw mattress laid on the floor. At other places he merely had straw covered with old sacks and his Texas saddle for a pillow. He prepared his meals, consisting, principally, of bread, bacon, and water, on a broken stove, which he boasted he had bought for 75 cents. All his surroundings and his personal appearance corresponded. When he needed eyeglasses, he bought three pair for a quarter and found them satisfactory. Once when he had to remain in Morganfield over night he rejected the suggestion that he go to a hotel and was perfectly satisfied to spread a tarpaulin on the concrete floor of a public garage and sleep there. He usually had many head of horses and mules, and in the winter would drive them from his farm in the lowlands to a higher place some 15 miles away. He put them in old barns with little or no protection from the weather and fed them mostly on straw or let them shift for themselves in the

fields. These things are but examples taken from the record of the conditions and the testator's manner of life.

His farming operations were on a very cheap scale, and he suffered the buildings to decay and become dilapidated. The accumulation of his estate was through saving rather than making of money. He was not avaricious. When he died, he owned 1,500 acres of land and an estate valued at more than $60,000. Testator thought every one else was needlessly extravagant. He continually talked of the sinful luxuries of the world, and was impressed with the idea, as expressed by one of his nephews, that "he only knew how to use money without ruining his morals." He was on friendly terms with his two brothers and his nephews and nieces living in the county, most of whom had large families and were poor, or, at least, in moderate financial circumstances. Although expressing an interest in their welfare, and particularly that the children should be educated in the parochial schools, he never made any gift or contribution to them. There was one exception. When one of the girls living in the neighborhood had been married a year or more, her "Uncle Tom" presented her with a couple of little pigs as a wedding present, coupled with the statement, however, that since there were too many in the litter, they would die if he kept them. A time or two, when some one suggested that he should help his kinfolks, he had said, "I am going to help them sometime," but he would purchase tickets to church picnics from the children. With all that, every witness testified that the testator was a good trader and, as one of them expressed it, "as honest as the day is long."

As a devout Catholic, testator was a faithful attendant at mass every Sunday. Father Rahm, who was the priest at Morganfield for thirteen years before the will was written, would say masses at the country church in his community once or twice a month, and when he did not Shoemaker would go to Morganfield to church. He had eaten dinner a few times at the priest's home, but Father Rahm testified there was no special intimacy between them and he knew Shoemaker like he did most of his other communicants. A time or two he borrowed money from Shoemaker, but the relations in that respect were strictly on a business basis, he having pledged his insurance policy as collateral.

Along with his anxiety over the worldly extravagances, testator continually expressed concern over the spiritual welfare of those with whom he talked.

There was no medical testimony concerning the testator's mentality. Based upon the conditions and manner of life, as above outlined, several laymen testified that in their opinion he did not have testamentary capacity according to the legal formula.

One day in the fall of 1926, the Rev. John A. Floersh, Bishop of the Diocese, attended a celebration at the Morganfield church. Shoemaker stated to Father Rahm that he would like to have a talk with the Bishop, the subject of which he did not disclose. He outlined to the Bishop what he wanted to do with his property, and asked him to have a will drawn accordingly. It appears he made no memorandum of those desires. Upon his return to Louisville, Bishop Floersh had his attorney to draft the will. It was sent by mail to Morganfield, but the Bishop did not remember whether it went directly to Shoemaker or to Father Rahm, nor did he recall that there was any correspondence about it.

Father Rahm testified he never saw the draft of the will until the day Shoemaker brought it to his home and asked him to witness its execution. There were some blank lines in it for the insertion of the names of the testator and of his father and mother. Also for the name of the priest to whom a bequest was made for the saying of masses for himself and his parents. Shoemaker told him the names of his parents and he filled in the blanks, including his own name as the priest who should say the masses, as requested by Shoemaker. The will was then signed and witnessed by Father Rahm and his housekeeper, Mary Ballman. Secrecy was enjoined as the testator said "he did not want the town talking about it, about giving out a lot of money." Shoemaker took the will away with him. When he was sick several months before he died, Father Rahm visited him and Shoemaker stated that if some time he should be found dead, "I want you to come down and get the papers out of that safe," pointing to an old safe in the room and telling him of the contents. This illness was not severe and he soon recovered. In January, 1929, more than two years after the will was executed, he was found dead. He was sixty-three years old.

. Both Bishop Floersh and Father Rahm testified emphatically that they had never discussed the matter of the will or the disposition of his property with the testator and had made no kind of suggestion to him regarding it. Although Father Rahm stated that some time before Shoemaker may have mentioned that he intended to make a will, he said nothing about it on the day he talked with the Bishop.

The will directed that the executor expend $500 for masses to be said for his soul and the souls of his father and mother and his deceased relatives. The remainder of the estate was bequeathed:

"All the remainder of my estate of whatsoever kind and wheresoever located, I give, devise and bequeath one-third to the then Roman Catholic Bishop of Louisville, Kentucky, a corporation sole, one-third to the Catholic Missionary Union, Incorporated under the laws of New York, for the Apostolic Mission House located at Washington, D. C., and one-third to the Catholic Church Extension Society of Chicago, Illinois."

The will also recited that the testator had loaned the Catholic Church Extension Society an amount of money which, with any other sum he might lend or give before his death to any of the beneficiaries named, should be deducted from the bequests. The will contains this clause:

"After due deliberation, I am making this disposition of my estate, and all my lifetime savings to be used and devoted to God's work and glory and the promotion of the welfare of His Church, as I do not feel that any one else has any claim upon my bounty."

The Bishop of Louisville was named as executor and in the event he should not be able to act or would prefer that some one else execute the will, he was given the right to nominate an executor. The instrument concludes with authority in his executor to sell and dispose of his property and make transfers and conveyances thereof in his discretion. To this was added, quite characteristically, "I humbly request that the service of the executor be without charge or with as little expense as possible."

The Bishop declined to qualify as executor, and the testator's brother John did so. After John's death, about four years later, this contest was instituted by testator's nephews and nieces and a surviving brother.

In considering the argument as to the sufficiency of the evidence on the issue of testamentary capacity, it is a familiar rule that opinions of nonexpert witnesses have no more probative value than the facts upon which they rest. If the factual testimony—as to testator's conduct, acts, and statements, his conditions and circumstances—as measured by the law does not afford evidence of mental incapacity, the opinions are disregarded as having been overcome by the facts. Bodine v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840, 841; Jackson's Ex'r v. Semones, 266 Ky. 352, 98 S. W. (2d) 505.

As one life differs from another, so it is that the same combinations of life, habits, traits, conditions, and circumstances are rarely if ever presented for the determination of the fact of capacity or incapacity of a testator, but he may be found compositely in several cases, each of which presented one or more of those characteristics.

Miserly, in the sense of stingy; austere; unclean and extremely parsimonious in his mode of living and personal habits and dress; queer and eccentric according to the usual standards of mankind; having the conception that every one else were spendthrifts; fearful of a baneful influence on others of the possession of money above meager existence and entertaining the view that his own self-denial was a virtue which worked to his moral and spiritual good. Thus may the testator be described, viewed from the standpoint of the contestants. No one, nor the cumulation, nor a combination of these characteristics with others not presented in this record, have been regarded by the courts as proving a lack of mind and memory to know in a rational way what property one has, or to understand who are the natural objects of his bounty, or to prove a lack of mental strength to select the persons or institutions whom he wishes to have his property and to bestow it upon them according to his own fixed or settled purpose. Page on Wills, sec. 157; Cecil's Ex'rs v. Anhier, 176 Ky. 198, 195 S. W. 837; Wigginton's Ex'r v. Wigginton, 194 Ky. 385, 239 S. W. 455; Dossenbach v. Reidhar's Ex'x, 245 Ky. 449, 53 S. W. (2d) 731; Greer's Ex'r v. Bishop, 265 Ky. 352, 96

S. W. (2d) 851; Wood v. Hankey, 133 Md. 389, 105 A. 430; In re Collins' Estate, 174 Cal. 663, 164 P. 1110; Cf. Thomas v. Thomas' Adm'r, 258 Ky. 236, 79 S. W. (2d) 982.

Surely it cannot be said by any court that piety or devotion to one's church and its institutions or solicitation for the spiritual welfare of others in whom he is interested indicates weak mentality or that religious zeal imputes testamentary incapacity. In Weir's Will, 9 Dana (39 Ky.) 434, a testator was extremely disturbed about his own spiritual welfare and had apprehension of almost immediate death. While in such troubled state of mind he executed his will, having his friend and pastor to attest it, and set his business in order. He did die six weeks later. Chief Justice Robertson wrote:

"Nor could we feel authorized to decide that, a high degree of enthusiasm, or even fanaticism, on the subject of religion, should per se be deemed legal insanity. The fact, however, that, whenever he could be diverted into any other current of thought, he was as rational as he had ever been, tends strongly to the conclusion that his mind, though sometimes swallowed up in despair, was nevertheless not unsound or radically diseased. * * *

"The best possible proof of a sound and disposing mind is 'a rational act, rationally done,' which reason alone could have conceived and accomplished. There is no use for metaphysics then; nor should speculation perplex the judgment when the question is solved by the palpable fact, that rational intellect shows itself by acts which can be the offspring of no other than an intelligent, sound and reasoning mind."

The testator in the case at bar is not shown to have been infirm of mind or even of body. He manifested no prejudice, antipathy, or aversion against his relatives or any one else and suffered from no insane delusions. He was not shown to have been unable to form true and accurate conceptions as to his property, its value or extent, or to understand his relations to his brothers and their families. He was not weak or vacillating, but consistent and steady in his views, abnormal though some of them were. His rigorous life and tenacious convictions indicate a will power. It is to be borne in mind

that oddities and singularities of behavior sometimes attend genius and do not of themselves establish mental weakness. Abnormality, whether it be pronounced eccentricity or extraordinary intellectuality, proves no disability to direct the course of one's property after he shall have departed this life. It is likewise to be remembered that in adjudging will cases we are not dealing with a question of sanity or insanity—whatever that mysterious malady called insanity may be according to medical science—for the law has its own standards of mental capacity and responsibility and to those standards we must look and by them be governed. We are of the opinion, therefore, that the evidence was not sufficient upon this issue to take the case to the jury.

On the matter of undue influence having been exerted, it must be remembered that mere motive or opportunity for undue influence is not sufficient and that it must appear that such influence was exercised; that the essential fact of undue influence is that it is such as to destroy the free agency of the testator and constrain him to do that which he would not otherwise have done if left to the exercise of his own judgment. But undue influence may be proved by circumstances leading up to and attendant on the execution of a will. Smith v. Smith, 243 Ky. 240, 47 S. W. (2d) 1936; Hanna v. Eiche, 258 Ky. 282, 79 S. W. (2d) 950; Page on Wills, sec. 744. The argument of the appellants is really not that there was any testimony of undue influence having been brought to bear upon testator. It is rather that the circumstances and the fact that the will had been prepared for him and his own religious inclinations easily led him to its execution. The mere fact that a will may be foolish, unnatural, or unjust does not show that it was the result of undue influence. Brewer v. Brewer, 154 Ky. 662, 159 S. W. 540; Page on Wills, secs. 192, 760. Its peculiar character is something to be considered and may measure the potency of any influence which may have been exerted, but alone is not enough. Jackson's Ex'r v. Semones, supra. However, it may be said that no will is unnatural in a legal sense if it is not contrary to the known views or conceptions of the testator or if it be such as he might have been expected to make, although it may differ from the ordinary actions of men in similar circumstances. In re Morgan's Estate, 219 Pa. 355, 68 A. 953. One giving his estate for the furtherance of

religious causes in which he is interested is proof that the disposition was according to his own fixed purpose.

It is pointed out that the testator's reasons for bequeathing his estate to the three religious institutions as stated in the will could not have been thus expressed by him because of his near illiteracy and that this was wholly the expression of another. However, it fully reflected his own views as judged by his life. It is very common for wills to be drawn by some one else than the testator, and in the absence of evidence affording a basis for it, the mere use of technical or other language which would not have been used by the testator himself raises no presumption of fact. Though the words may be those of the scrivener, the disposition of the property is that of the one who adopts them. If he understands the effect of the instrument as a whole, it is not material that he did not understand the meaning of all the words used. If that were not so, many wills would be invalid on this ground, especially those involving intricate trusts which oftentimes dispose of large estates in terms which give judges and lawyers trouble in determining their meaning and legal effect. Conrades v. Heller, 119 Md. 448, 87 A. 28. The testator knew the contents of the will and adopted the recitation of the reasons and all other parts of the instrument as his own, and kept it in his possession for over two years knowing what was in it.

In McFarland v. Sharkey, 149 App. Div. 552, 133 N. Y. S. 1062, the testator, a few days before his death, had a friend to call an attorney. He advised the lawyer, a stranger, that he desired to divide the bulk of his property among Catholic charities, and requested him to obtain information and give him advice in the matter. The attorney returned in two days and the will was executed. The larger part of his $60,000 estate was bequeathed to numerous charities with $500 for masses. Testator gave intelligent reasons for making such disposition of his property. It was held that giving requested advice is not undue influence and that there was nothing to indicate the testator had not exercised his own judgment and made the will according to his own free, voluntary, and intelligent act.

In McEnroe v. McEnroe, 201 Pa. 477, 51 A. 327, 328, the chief beneficiary in the will of a testator, who

had nephews and nieces, was a second cousin, a Roman Catholic priest, between whom and the testator there had been a long and close friendship, and who, during testator's last illness, had visited him and asked him whether he had made his will. Receiving a negative reply, the priest advised him to do so and at testator's solicitation he thereupon wrote down the outlines of the will from his dictation. From this note an attorney, previously unknown to the beneficiary, prepared the will and had it executed. After conceding for the purposes of the case the existence of his confidential relation, the court said:

> "Here one of the most significant facts tending to show undue influence is wholly absent. There was no impairment of the mental powers; no clouding of intelligence."

See, also Caughey v. Bridenbaugh, 208 Pa. 414, 57 A. 821.

We do not regard the case of Pilstrand v. Swedish Methodist Church, 275 Ill. 46, 113 N. E. 958, as militating against the views above indicated, or our conclusion that the evidence in this case was not sufficient to authorize a submission to the jury on the issue of undue influence.. The facts are materially different. The testator devised one-fifth of his estate to his pastor with whom he was on very intimate and friendly relations, and the balance to his local church and the institutions of his denomination. The pastor had gone to an attorney and had him draft the will according to his instructions and then had taken the testator to the lawyer's office where the will was executed. The court stated, in effect, that under those circumstances, the beneficiary occupying the confidential relation of a spiritual adviser, undue influence would be presumed and the will set aside unless it be further established that the will expressed what the testator wanted free from any action or influence of the beneficiary. It is to be observed that the judgment sustaining the will was affirmed.

The execution of the will is brought in question. Father Rahm's testimony shows it to have been duly and properly executed. It was then shown by the proponents that the other subscribing witness, Mary Ballman, was a nonresident and absent from the state at the

time of the trial. Although her deposition had been taken, it was not offered to be read. Before the close of their evidence, the contestants placed her on the witnsss stand. Although it may be deduced from her testimony that she was present and signed the will in the presence of the testator and Father Rahm, and they did so in her presence, yet in the main she professed having no memory of what occurred. By way of contradiction, it was shown that she had made a written statement some time previous to the effect that Shoemaker never acknowledged to her that the paper was a will and she did not know at the time she signed it that it was a will.

It is submitted that the court should have directed a verdict that this was not a will. The argument is predicated upon section 4836, Kentucky Statutes, which is in part as follows:

"If a will is attested by a person to whom· * * * any beneficial interest in any estate is thereby devised or bequeathed, if the will may not be otherwise proved, such person shall be deemed a competent witness; but such devise or bequest shall be void."

The claim of incompetency of Father Rahm as a witness to testify as to the execution of the will' is rested upon the provision following the bequest of $500 for the saying of masses:

"If Father Rahm is living at the time of my death, I want him to see and attend to the saying of masses, as indicated in this will."

Father Rahm testified that he had received $500 from the estate, but had forwarded $100 of it to the "Extension" to have one-half or more for the masses said, as testator's request had been that they should be said as soon as possible and he could not do so. The statute makes a beneficiary a competent witness. Calvert v. Calvert, 208 Ky. 760, 271 S. W. 1082; Cromwell v. Stevens, 212 Ky. 209, 278 S. W. 555; Barnes v. Graves, 259 Ky. 180, 82 S. W. (2d) 297.

We are of opinion the peremptory instruction was properly given.

Judgment affirmed.