# Perkins' Guardian v. Bell et al.

June 22, 1943.

Rodes K. Myers, G. D. Milliken, Sr., and Harlin & Harlin for appellant.

John B. Rodes and Charles R. Bell for appellee.

OPINION OF THE COURT BY JUDGE REES—Affirming.

R. C. P. Thomas died testate November 11, 1939, a resident of Warren county, Kentucky. His will was executed on January 8, 1937, and three codicils thereto were executed on December 15, 1937, November 22, 1938, and July 28, 1939, respectively. His heirs at law at the time of his death were Thomas R. Thomas, a nephew, and Thomas Meguiar Perkins, a great-nephew, then 8 years of age. The latter, who received nothing under the will, acting through his father and statutory guardian, Presley M. Perkins, instituted an action in the Warren circuit court attacking the will on the grounds of testamentary

incapacity and undue influence. On the trial before the regular judge of the Warren circuit court, the contestant dismissed the action without prejudice when the judge indicated at the conclusion of all the evidence that he would sustain the contestees' motion for a directed verdict in their favor. Thereafter this action was instituted upon the identical grounds of the first one, and at a trial had before a special judge the contestees' motion at the conclusion of all the evidence for a directed verdict for the will was sustained. There was no proof on the issue of undue influence, and the sole question presented by this appeal is whether the evidence as to mental incapacity was sufficient to take the case to the jury.

R. C. P. Thomas was the youngest of three brothers. Frank M. Thomas, the eldest of the three brothers, was a distinguished minister of the Methodist Church. He died in 1921, leaving three children, Thomas R. Thomas, Frank M. Thomas, Jr., and Elizabeth Thomas, who later married Presley M. Perkins. Frank M. Thomas, Jr., died unmarried in 1933 at the age of 22, and Elizabeth Thomas Perkins died in 1934, leaving one child, the appellant, Thomas Meguiar Perkins. Thomas W. Thomas, the testator's older brother, never married and died in 1930. He and the testator were law partners and the firm enjoyed a lucrative practice. R. C. P. Thomas was a member of the first Workmen's Compensation Board of Kentucky, and served as judge of the Warren county court from 1930 to 1933 when he resigned and was appointed by the President as United States District Judge of the Panama Canal Zone for a 4-year term beginning July 1, 1933, and ending July 1, 1937. At the end of his term he returned to Bowling Green and resumed the practice of law. He and his brother Thomas W. Thomas lived together in the old family home in Bowling Green until the latter's death in 1930. Shortly after the death of his brother, when he was nearly 60 years of age, he married Miss Margaret Hogle of Nashville, Tennessee, who survived him about 18 months. During his term of office as District Judge of the Panama Canal Zone he and his wife returned regularly each Christmas season to Bowling Green. It was during one of these visits that the will in contest was written on January 8, 1937. At the time of his death the gross amount of his estate was approximately $180,000, of which about one-half had been inherited from his mother, his brother, Thomas W. Thomas, and his uncle, D. W. Wright. The will consists

of fifteen typewritten pages, and was witnessed by C. W. Lampkin, R. D. Graham, and W. S. Hill. It was preceded by two other wills, one written in Panama on October 2, 1934, and another written there on February 7, 1935. In the second paragraph of the 1934 will the testator set out in full a prenuptial contract between him and his wife dated September 1, 1930, a few days before their marriage. This contract provided for the establishment, as of his death, of a trust fund of $50,000 and the payment to her of the income therefrom as long as she lived. She relinquished her dower interest in his estate. In the 1934 will he added $10,000 to the contractual amount, thus increasing the trust fund for his wife to $60,000. In the fourth paragraph of the will he provided that in the event he died leaving no issue his estate, after the trust for the benefit of his wife had been carried out, should be held in trust for his nephew Frank M. Thomas during his life, and at his death the income therefrom should go to Frank M. Thomas' brother, Thomas R. Thomas, during his life. The will provided that upon the death of his wife and two nephews the trust fund should go to Ogden College. He made no provision in the 1934 will for his great-nephew, Thomas Meguiar Perkins, but this appears in paragraph 4 of the will:

> "In this will I am making no devise to Thomas M. Perkins, only son of my deceased niece, Elizabeth Thomas Perkins, who is a boy six or seven years of age, as he inherited an estate from his mother which was devised to her by the will of my brother, Thomas W. Thomas, and which since his mother's death has been taken charge of by P. M. Perkins, father of Thomas M. Perkins, and if said child's estate is husbanded and wisely handled for the child's benefit said child will have ample funds to fully educate him and to give him a good start in life, more than the average boy. Likewise, I am making no devise which would include or could avail any heirs or children of either of my nephews, Thomas R. Thomas and Frank M. Thomas, because I desire the corpus of my estate to eventually go to a cause which has been ever the object of my endeavor and heart and will be hereinafter set out."

The object referred to was Ogden College. Frank M. Thomas died in November, 1934, and his death apparently brought about the execution of the second will on

February 7, 1935, since the testator, in paragraph 4, said:

"Outside of my wife, Margaret H. Thomas, my affections were centered in my beloved nephew, Frank M. Thomas, who died on November 30, 1934, due to the fact that I reared him since a lad. It is no longer necessary for me to make any provision for him, which I had done during his life and would have done if he had lived."

In this will the $10,000 added to the wife's trust fund by paragraph 2 of the first will was made an absolute gift to her. A trust fund of $25,000 was created, the income therefrom to be paid to the testator's nephew, Thomas R. Thomas, during his life. After making a bequest of $1,000 to the Methodist Church of Bowling Green the testator left the remainder of his estate to Ogden College, and provided that the trust estates created for the benefit of his wife and nephew should go to Ogden College at their deaths.

In the will in contest dated January 8, 1937, the testator increased the trust fund for the benefit of his wife from $60,000 to $65,000 and, in addition, gave her $10,000 absolutely as in the second will. He made the same provision for his nephew, Thomas R. Thomas, as was made in the second will, gave $1,000 to the Methodist Church, and left the remainder of his estate to Ogden College. The trust estates also were to go to the college after the deaths of his wife and nephew. He repeated in the second and third wills the reasons set forth in the first will for making no bequest to his great-nephew, Thomas Meguiar Perkins. The first codicil dated December 15, 1937, was written in the testator's handwriting, and was not witnessed. In it he merely made minor changes in the distribution of certain articles of furniture. Codicil No. 2 dated December 22, 1938, was witnessed by H. D. Willock, an attorney, and Helen Pappas, a stenographer in the attorney's office. By it the testator increased the trust fund created for the benefit of his wife from $65,000 to $90,000. Codicil No. 3 dated July 28, 1939, was witnessed by J. E. Bibb, Clinton Rigsby, and Annie Pearl Phelps. This codicil amended items 9 and 10 of the original will. In item 9 of the original will the testator named Charles R. Bell and John B. Rodes executors of the will and trustees of each of the trusts created by the will, and in item 10 he appointed

John B. Rodes his successor as regent and trustee of Ogden College as he was authorized to do under the will of **Robert Ogden**, founder of the institution. In the codicil he substituted the name of Cooper R. Smith for the name of John B. Rodes, and assigned as a reason for the change the advanced age of Mr. Rodes, though expressing his high regard for him.

On the trial of the case the contestees proved the execution of the will and codicils by the attesting witnesses, and the contestant then introduced a large number of witnesses several of whom expressed the opinion that the testator lacked testamentary capacity. The testimony of these witnesses must be considered in the light of the rule that opinions of nonexpert witnesses that the testator was of unsound mind possess no more probative value than the facts upon which they are founded. Several witnesses who stated that in their opinion the testator lacked testamentary capacity or expressed doubt on the subject failed to describe a single incident, act of the testator or conversation on which the opinion was based. Almost without exception the opinion was based on the will and the fact that the witness considered it unfair and unjust. We shall limit our discussion to the testimony of witnesses who attempted to state facts in support of their opinions.

Presley M. Perkins, father of Thomas Meguiar Perkins, testified that he married Elizabeth Thomas, niece of the testator, in 1927, and that his relations with the testator were friendly until some time in 1933, a few months before his wife's death and a short time before the testator went to the Panama Canal Zone. The testator had invested, or assisted in investing, the funds received by his niece, Mrs. Perkins, under the will of her uncle, Thomas W. Thomas, and he kept her bonds and other securities in his safe deposit box in a Bowling Green bank. The witness was informed by his wife, who was ill with tuberculosis, that her uncle had visited her and suggested she should have a will and that he would prepare one and deliver it to her on the following day. The witness telephoned to Mr. Thomas and said: "Will you please not write any paper and bring it out here for her to sign. She is in no condition to be disturbed." In the course of the telephone conversation Mr. Thomas became very angry, and on the following morning sent to his niece her bonds and other securities which he had been keeping in his safe deposit box. Thereafter his at-

titude toward the witness was not friendly. After the death of Mrs. Perkins, Mr. Thomas opposed the appointment of Presley M. Perkins as guardian of his infant son. His objection apparently was limited to the control by Mr. Perkins of his son's estate. The witness described the testator as "a very egotistic, emotionally unsound individual," and, in answer to the question on mental capacity, said:

"I would say he did not possess that. He might have known his property * * *. I do not think he had sufficient capacity to know his kinfolks, to recognize his obligations and his duties to them, considering the fact that all of his money came from his family, came from Webb Wright, came from his brother and came from his mother. He got some fifteen thousand dollars, I think from his mother. I do not think he had sufficient capacity to recognize his obligations and his duties to his kinfolks and to make a will according to a fixed purpose of his own."

Claude W. Duncan expressed the opinion that Mr. Thomas at times was a normal man and at other times was not. He was asked to relate any incidents which caused him to believe that the testator was not at times a normal man and he referred to an occasion when his daughter teased Mr. Thomas about a woman and he became offended and left. Charles C. Sullivan, ex-chief of police of Bowling Green, expressed the opinion that the testator lacked mental capacity to make a will, and in support of his opinion related two incidents. Some time in 1939 he drove up to a gasoline filling station and the testator, who was sitting in the station, got up and seated himself in the witness' car. The witness asked him where he wanted to go and he said he wanted to go to his home. He then lived on his farm just outside the corporate limits of Bowling Green. They conversed during the four minute drive to the testator's home, and when he arrived he looked at the witness and said: "That's Charlie, isn't it?" and laughed. In 1928 or 1929 the witness had a conversation with Mr. Thomas in Louisville, Kentucky, in which the latter said: "Charlie, you know when a man begins to get old he begins to lose everything. He loses his mind, his mind doesn't work; he loses his temper, his temper won't work." Porter Y. Ewing was the county clerk during the testator's term of office as county judge. He stated that the

testator was of a very nervous temperament, and displayed his temper by beating his gavel ''pretty loud.'' He related an incident when the testator was acting as judge of the juvenile court and sent for switches in order that the father of a small boy in custody as a delinquent child might punish the child in the testator's presence. Similar occurrences were testified to by other witnesses, and it is argued that this shows sadistic tendencies. The witness admitted that he had several controversies with Judge Thomas over the fees of his office, and that he turned back to the county treasury several thousand dollars. Campbell Jones, formerly of Charlottesville, Virginia, where some of the Thomas relatives lived, frequently talked with Mr. Thomas about his Virginia relatives, but after the latter's return from Panama he seemed uninterested in them. The witness said Mr. Thomas seemed to have hallucinations, and when asked to specify them he said Mr. Thomas complained because he was not making money from his farming operations. John Eadens served as a member of the fiscal court of Warren county when the testator was judge. Pressed for a reason for his opinion that the testator lacked testamentary capacity he cited the changes inaugurated by Judge Thomas in the methods of dealing with pauper claims and the road program. Prior to his term of office it had been the custom for the various magistrates, as members of the fiscal court, to issue orders for money and supplies to paupers in their respective districts and to control the expenditure of road funds in their districts. Judge Thomas abolished this system, and centralized authority in the fiscal court as a body. The witness did not approve of the change. A. C. Taylor described the testator as ''a man that was self-opinionated, extremely egotistical.'' When asked his opinion as to the testator's mental capacity to make a will, he answered: ''Well, I seriously doubt his ability to deal fairly with his relatives and the objects of his bounty. I seriously doubt it.'' On cross-examination he was asked if the testator had sufficient mind to dispose of his property according to his own will and according to his own purpose, and the witness answered: ''Well, I think he disposed of it as he wanted to; but as to whether or not that was a fair and equitable disposition, that was another question in my mind.'' Mrs. Elizabeth Thomas, wife of Thomas R. Thomas, nephew of the testator, testified that testator was highly nervous, frequently became angry and ''ex-

ploded.'' She related some minor incidents including an occasion when she and her husband were visitors in the testator's home in Bowling Green. Frank M. Thomas stated that he, his brother, and his sister-in-law were going to Louisville to see Mrs. Perkins, who was in a tuberculosis sanitorium. The witness testified that the testator ''flew into a rage and said we didn't care anything about Elizabeth and weren't going to Louisville to see her; that we were going for fun.'' She referred to a visit she and her husband made to the testator's home in 1938 while he was living in the Panama Canal Zone, and said they were treated ''beautifully.'' When asked whether in her opinion the testator possessed the mental capacity to make a will, she answered: ''I think he knew his kinfolks. I certainly think he knew who they were and he knew what property he owned, but I don't think he was mentally capable of making a fair will.'' On cross-examination she stated that during her visit to Panama in 1938 she entertained no doubt of the testator's mental capacity to make a will, and entertained no doubt on the subject at any time until after his death and after she had read the will. She admitted that her answers to questions as to his mental capacity were based on the contents of the will. Thomas R. Thomas, named a contestee in the suit, was called by the contestant as a witness as if on cross-examination. As heretofore stated, he was given the income for life from a $25,000 trust fund under the will. In the absence of a will he would inherit one-half of the estate. He related the incidents referred to by his wife, and when asked by counsel for contestees whether in his opinion his uncle possessed the mental capacity to make a will answered: ''If I have to answer, I would answer it affirmatively, that I do.'' Charles Jenkins expressed the opinion that the testator lacked testamentary capacity. The only incident related by him was the following: The witness' father purchased from Mr. Thomas 25 goats and sent him a check for the purchase price. On the face of the check he wrote: ''For 25 thin goats.'' Mr. Thomas returned the check to the purchaser and requested him to write another check leaving out the word ''thin.'' The purchaser refused, and Mr. Thomas cashed the check. Dr. Milton Board, an expert medical witness, employed by contestant, testified that he knew the testator for many years and was medical director of the Workmen's Compensation Board when R. C. P. Thomas was a mem-

ber. He described the testator as "an erratic man, emotional, very definite in his likes and dislikes, something of an egotist, though not of the kind that made you dislike him, but you recognized the fact that his ego was profound." He was asked the customary question as to mental capacity and answered:

"Well, you have asked me three questions in one, and I will answer them one at a time. From my observation of Mr. Thomas over a long period of years, I would say that he very definitely knew the nature and value of his property. Second, that he knew— that is to say, he was able to recognize and knew— his heirs at law or the natural beneficiaries of his bounty. Third, I would give the opinion that he was not mentally capable of recognizing or doing his duty through a fixed purpose as a testator, a normal testator, should do. Now, may I elaborate that latter phase just a little and give my reasons for reaching that conclusion?"

The witness elaborated at considerable length, but stated frankly that his opinion was based on his belief that "there should be some extraordinary reason why any testator in a will should depart very far from what the law would do and does do." Dr. William Frederick Orr, a psychiatrist of Nashville, Tennessee, was not acquainted with the testator, but he was given a copy of the will and asked to analyze it and its author. He said:

"To my mind, there is no evidence of any intellectual defect in Judge Thomas. The will shows a great clarity of expression, and certainly no witness has brought up any fact which I would think would lead anyone to believe there was anything wrong with his intellect. However, his emotional capacity, which is the other part of our personality which I was mentioning, seems, from a great many things, to have been quite unusual, and, as Dr. Board said, erratic and eccentric."

He was asked the customary question as to mental capacity based on his analysis of the will and the two former wills, and the answer, which was not wholly responsive, was withdrawn by counsel for the contestant.

Other witnesses were introduced by the contestant, but the facts elicited from them for the purpose of show-

ing lack of testamentary capacity were even more trivial than those related above. In view of our conclusion that the evidence introduced by the contestant was not sufficient to take the case to the jury, it is not necessary to discuss the evidence of the contestees. It is sufficient to say that they introduced more than sixty witnesses, including Federal and State judges before whom the testator had practiced during the last years of his life, lawyers who had practiced with and against him, physicians who had known him for many years, including his attending physician, bankers, businessmen, and men and women from all walks of life who knew him intimately. All of them testified positively that he possessed testamentary capacity, and the witnesses related facts having probative value in support of their opinions. Analysis of the testimony of the contestant's witnesses shows that without exception their opinions were based on their concepts of a fair and just will. They considered the will in question to be unfair and therefore concluded that the testator lacked the requisite mental capacity to make a will.

The owner of property, if of sound and disposing mind, may transmit his property in such manner as pleases him, and a will is not invalid because he departs from the statutory plan. Cecil's Ex'rs v. Anhier, 176 Ky. 198, 195 S. W. 837; Bailey v. Bailey, 184 Ky. 455, 212 S. W. 595; Combs v. Combs, 271 Ky. 543, 112 S. W. (2d) 989. As was said in Jackson's Ex'r v. Semones, 266 Ky. 352, 98 S. W. (2d) 505, 509:

"The law does not require that a testator in disposing of his property shall be humane or even just. An unjust will is not necessarily an irrational act, for if one possesses the requisite mental capacity he may make an unreasonable or unjust will and may disinherit his children."

There is nothing approaching unanimity of opinion upon the degree of mental disorder which is required to produce testamentary incapacity and it is difficult to devise a standard to measure it which will serve as a real guide to the fact trier, but this court has held consistently that perfect sanity is not a requisite of testamentary capacity and that persons distinctly subnormal or abnormal mentally may be competent to make wills. Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. (2d)

877; Compton v. Smith, 286 Ky. 179, 150 S. W. (2d) 657. In McCrocklin's Adm'r v. Lee, 247 Ky. 31, 56 S. W. (2d) 564, 569, the court said:

"Mere weakness of mental power will not render a person incapable of executing a will. It is not necessary that he should be competent to make contracts or transact business. Old age and failure of memory do not of themselves necessarily take away a testator's capacity to dispose of property."

In the present case the evidence for the contestant wholly failed to show any weakness of mental power of the testator. On the contrary, it showed he was a successful lawyer, businessman and public official, was endowed with far more than average mentality and retained his mental vigor to the end. The most that can be deduced from the evidence is that he was vain, fractious, short tempered, and nervous. One or two witnesses described him as eccentric without stating facts sustaining their conclusions, but eccentricities amounting to no more than slight peculiarities do not establish lack of testamentary capacity. Clark v. Johnson, 268 Ky. 591, 105 S. W. (2d) 576; Greer's Ex'r v. Bishop, 265 Ky. 352, 96 S. W. (2d) 851. The trivial incidents related by the contestant's non-expert witnesses in support of their opinions that the testator did not possess testamentary capacity were without probative value. The opinions expressed by these witnesses can rise no higher than the facts upon which they are based. Middleton v. Skaggs, 263 Ky. 81, 91 S. W. (2d) 1016; Moran's Ex'r v. Moran, 238 Ky. 403, 38 S. W. (2d) 207.

It is argued that Ogden College, the ultimate beneficiary of practically the entire estate, is a defunct institution, and the will therefore is an unnatural one. The facts briefly stated are these: Ogden College was founded in 1873 by Robert Ogden who left a large sum of money by his will for the purpose. In his will he appointed Voltaire Loving regent of Ogden College with power to appoint his successor by will, the succeeding regents to have the same power. Voltaire Loving appointed his son, Hector Loving, who served as regent until his death in 1910, and he appointed as his successor Voltaire Loving's nephew, D. W. Wright, who served until his death in 1922. D. W. Wright in turn appointed as his successor his nephew, R. C. P. Thomas, the testator, who was a graduate of the college as were his two brothers. There

are now more than 500 alumni of the college living in Warren county. The assets of the college, including the campus and buildings valued at $125,000, amount to $300,000, and the annual income from its investments amount to $8,000 or $9,000. In 1926 the testator, as regent, and the board of trustees entered into a contract with Western State Teachers College whereby the campus and college buildings were leased to Western State Teachers College for a period of 20 years. The campus of Ogden College adjoins the campus of Western State Teachers College. During the first ten years of the lease period 75% of the income from the investments of Ogden College and during the last ten years 25% of the income are to be retained by it and added to its endowment funds. With the testator's gift added to these funds it is reasonable to believe that the college will be able to resume its activities at the end of the lease period.

It is also argued that the testator entertained an unreasonable prejudice against Presley M. Perkins, father of Thomas Meguiar Perkins, and influenced by this prejudice wrote an unnatural will omitting therefrom one of the natural objects of his bounty. A testator in making his will has a right, if he is mentally capable, to make unequal distribution of his property among his heirs or to give it to strangers, and the fact that a relative is excluded because of prejudice does not indicate want of testamentary capacity if such prejudice does not amount to an insane delusion as that term has been defined by this court. Moates v. Rone, 242 Ky. 287, 46 S. W. (2d) 100; Trustees of Epworth Memorial Methodist Church v. Overman, 185 Ky. 773, 215 S. W. (2d) 942. Clearly the facts relied on do not tend in the least to show that at the time of the execution of the will and the codicils thereto R. C. P. Thomas lacked testamentary capacity.

It follows that the trial court correctly sustained appellees' motion for a peremptory instruction, and the judgment is affirmed.

Whole court sitting except Judge Sims.